Rehearing en banc granted by order filed
9/16/03.  Opinion filed 5/30/03 is vacated.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MATTHEW DIXON,
   *Plaintiff-Appellant,*

v.                 No. 02-1266

COBURG DAIRY, INCORPORATED,
   *Defendant-Appellee.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, District Judge.
(CA-01-53-2-12)

Argued: December 4, 2002

Decided: May 30, 2003

Before GREGORY, Circuit Judge, Joseph R. GOODWIN,
United States District Judge for the Southern District of
West Virginia, sitting by designation, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

———————————————————

Affirmed in part and reversed in part by published opinion. Judge
Gregory wrote the opinion, in which Senior Judge Michael joined.
Judge Goodwin wrote an opinion concurring in part and dissenting in
part.

———————————————————

**COUNSEL**

**ARGUED:** Samuel Wilson Howell, IV, HOWELL & LINKOUS,
L.L.C., Charleston, South Carolina, for Appellant. J. Thomas Kil-

patrick, ALSTON & BIRD, L.L.P., Atlanta, Georgia, for Appellee. **ON BRIEF:** Alan B. Linkous, HOWELL & LINKOUS, L.L.C., Charleston, South Carolina; Mikell R. Scarborough, Charleston, South Carolina, for Appellant. Christopher S. Enloe, ALSTON & BIRD, L.L.P., Atlanta, Georgia, for Appellee.

---

## OPINION

GREGORY, Circuit Judge:

Matthew Dixon, an employee of Coburg Dairy, Inc., was asked by his employer to remove two Confederate flag stickers from his tool box after an African-American co-worker complained. Dixon refused to remove the stickers, and Coburg, relying on the company's anti-harassment policy, fired Dixon. Dixon then filed suit in South Carolina state court, alleging wrongful discharge and a "Violation of Constitutional Rights." Coburg removed the case to federal court on the ground that Dixon's complaint necessarily depended on the resolution of a substantial question of federal law. Dixon filed a motion to remand, which the district court denied. The district court then granted Coburg's motion for summary judgment and dismissed the case. Dixon appeals both of the district court's rulings. For the reasons discussed below, we affirm in part and reverse in part.

I.

In April 1997, in Charleston, South Carolina, Matthew Dixon, began his employment as a mechanic with Coburg Dairy, Inc., ("Coburg"). In April 2000, Dixon was given a copy of Coburg's policy prohibiting harassment. The policy explained that "[h]arassment may take many forms, including . . . [v]isual conduct such as derogatory posters, cartoons, drawings, or gestures." The policy also warned employees that anyone "who behaves in a manner that is inconsistent with this policy will be subject to discipline up to and including termination."

Dixon is an active member of the Sons of Confederate Veterans ("SCV"), an all-male organization whose members "can prove genea-

2

logically that one of their ancestors served honorably in the armed forces of the Confederate States of America." *Sons of Confederate Veterans v. Comm'r of the Va. Dep't of Motor Vehicles*, 288 F.3d 610, 613 n.1 (4th Cir. 2002). Beginning in January 2000, a conflict developed among South Carolinians over whether to remove the Confederate battle flag from atop their state capitol dome. As Dixon notes, this conflict became "a burning issue in the State of South Carolina," marking a "period of intense national scrutiny and public debate." (Br. for Appellant at 4.)

It was in this context that Dixon placed two Confederate battle flag stickers on his personal tool box. One was visible on the outside of the box; the other was inside the box, but visible when the box was open. Dixon used the tool box and displayed both flag stickers while at work inside the Coburg Dairy garage. An African-American co-worker, Leroy Garner, confronted Dixon and informed him that he found the stickers racially offensive and a violation of Coburg's harassment policy. Dixon disagreed, maintaining that his display of the stickers did not violate Coburg's policies and, notwithstanding any policy to the contrary, that it was his constitutional right to display the flag. Thereafter, Dixon, Garner, and Coburg attempted to mediate a compromise. Coburg offered to buy Dixon a new, unadorned tool box, allowing him to keep his previously decorated box for home use. Dixon responded that his heritage was "not for sale." In the end, Coburg insisted that the stickers be removed, and Dixon refused. Having reached an impasse, Coburg fired Dixon on September 5, 2000, on the ground that he had violated the company's anti-harassment policy.

Dixon filed a nine-count complaint in South Carolina state court. Count I, titled a "Violation of Constitutional Rights," alleged that "Coburg violated the constitutional rights of its employee by its termination of Plaintiff." In Count III, Dixon stated a claim for "Violation of Public Policy" based on S.C. Code Ann. § 16-17-560 (2002). He alleged that he was fired for displaying the Confederate flag, and that this action "constitute[d] a violation of South Carolina criminal law and therefore a violation of the public policy of this State." Premised on these same facts, Dixon articulated a claim in Count IV for retaliatory discharge.

3

Insisting that Counts I, III, and IV raised substantial questions of federal law, Coburg removed the case to federal court. Dixon filed a motion to remand, which the district court denied. The parties then filed cross-motions for summary judgment. The district court granted Coburg's motion for summary judgment and dismissed the case. This appeal followed.

## II.

Whether federal subject matter jurisdiction exists is a question of law that this Court reviews *de novo*. *Mulcahey v. Organic Chemicals Co., Inc.*, 29 F.3d 148, 151 (4th Cir. 1994). The grant of a motion for summary judgment is also reviewed *de novo*. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).

## III.

### A.

Coburg's removal to district court was based on 28 U.S.C. § 1331 (2001), giving federal courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Count I of Dixon's complaint is titled, "Violation of Constitutional Rights," and asserts a claim based upon"[t]he First Amendment to the U.S. Constitution." Dixon maintains in this count that "Coburg violated the constitutional rights of its employee by its termination of Plaintiff," and he concludes, "Coburg's termination of Plaintiff for display of the flag constitutes a violation of his constitutional rights entitling Plaintiff to an award for damages." At its core, Count I appears to require a determination as to whether Coburg's actions amount to a violation of Dixon's free speech right under the United States Constitution. This appearance, however, is illusory, as Dixon concedes that the First Amendment protects citizens only from government or State interference with their rights to free speech, *see Rendell-Baker v. Kohn*, 457 U.S. 830, 837 (1982), and further concedes that Coburg Dairy is not a state actor.

"[F]ederal courts are without power to entertain claims otherwise within their jurisdiction if they are `so attenuated and insubstantial as

4

to be absolutely devoid of merit'. . . ." *Hagans v. Lavine*, 415 U.S. 528, 537 (1974) (internal citations omitted). At the same time, however, "`Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [a plaintiff] could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." *Id.* at 542 (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Thus, before assuming jurisdiction over Dixon's case based on a supposed federal cause of action in Count I, we must determine if the insubstantiality doctrine deprives us of jurisdiction to even consider this claim.

In *Bell v. Hood*, the Supreme Court explained:

> The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal states clearly appears to be immaterial *and made solely for the purpose of obtaining jurisdiction* or where such a claim is wholly insubstantial and frivolous.

*Id.* at 682-83 (emphasis added). As this quotation suggests, the insubstantiality doctrine is best (though not exclusively) applied in cases where the plaintiff has attempted to abuse Rule 8's liberal pleading requirements by drafting a complaint that appears on the surface, though not in substance, to rely upon a question of federal law. This reading of the rule is supported by this Circuit's decision in *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999), where we observed, "As we warned in *Davis [v. Pak*, 856 F.2d 648, 651 (4th Cir. 1988)], federal courts must guard against the litigant who frames a pretextual issue solely for the purpose of having a state-law claim adjudicated in the federal system; Article III of the Constitution forbids this practice."

The *Bell* Court has further commented that the insubstantiality doctrine is a disfavored rule, and "[t]he accuracy of calling these dismissals jurisdictional has been questioned." 327 U.S. at 683 (citing Justice Holmes' ruling in *The Fair v. Kohler Die and Specialty Co.*, 228 U.S. 22 (1913)). In the past, we have invoked the insubstantiality doctrine sparingly, *see Larch v. Eastern Band of Cherokee Indians*, 872 F.2d

5

66, 68 (4th Cir. 1989) (noting that "[t]he Tribe's complaint satisfie[d] th[e] relatively low jurisdictional threshold imposed by the doctrine"), and only in cases where a plaintiff has drafted a frivolous count solely for the purpose of filing a claim in federal court. *See Davis*, 856 F.2d 648; *Lovern*, 190 F.3d 648; *Goldsmith v. Baltimore*, 845 F.2d 61 (4th Cir. 1988); *Holloway v. Schweiker*, 724 F.2d 1102 (4th Cir. 1984).

Still, the insubstantiality doctrine seeks to do more than prevent plaintiffs from engaging in forum shopping. More fundamentally, the rule ensures that federal courts assert jurisdiction solely over live cases and controversies. *See* U.S. Const. art. III, § 2. Where a claim is "so attenuated and insubstantial, obviously frivolous, plainly insubstantial, or no longer open to discussion," there is no controversy for a federal court to adjudicate. *Davis*, 856 F.2d at 650-51 (quoting *Hagans*, 415 U.S. at 536-37). To this point, the Appellant argues, "[T]here are no federal causes of action available to Dixon under the facts of this case," an observation which is undoubtedly true. As stated above, Count I is not cognizable under 42 U.S.C. § 1983 because Coburg is not a state actor. Additionally, Dixon has no claim under 42 U.S.C. § 1981 because there is no suggestion that he was treated differently by Coburg on account of his race. By conceding each of these points, Dixon has failed to allege any cause of action in Count I. Accordingly, the claim does not present us with a controversy that we might even attempt to resolve.

Despite the lack of any federal claim in Count I, this Court may still retain jurisdiction over the remainder of the case if the state causes of action alleged in Counts III and IV "`necessarily depend[ ] on the resolution of a substantial question of federal law.'" *Mulcahey v. Organic Chem. Co., Inc.*, 29 F.3d 148, 151 (4th Cir. 1994) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 28 (1983)). In *Franchise Tax Board*, the Supreme Court held that "unless it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims," federal question jurisdiction does not exist. 463 U.S. at 13. The Fourth Circuit has explained, "[I]f `the right set up by [a] party may be defeated by one construction of the constitution or law of the United States, and sustained by the opposite construction,' jurisdiction can be had in the federal courts." *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 806 (4th Cir. 1996). That is, the claim containing the federal issue

6

must rise or fall on the resolution of that federal issue. If federal law merely forms an element of a state cause of action, that may be insufficient to give rise to federal question jurisdiction if the case actually turns on other, purely state-law elements of the claim. *See Clark v. Velsicol Chemical Corp.*, 944 F.2d 196, 198 (4th Cir. 1991) ("Application of the particular federal statute in this case would remain but an element in plaintiff's state negligence action and cannot give rise to federal question jurisdiction.").

To prevail on Count III, Dixon would be required to show that: (1) he exercised a political right or privilege that is "guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State"; and (2) he was later discharged for exercising that right or privilege. S.C. Code Ann. § 16-17-560.[1] The parties stipulated to all of the material facts before filing their respective motions for summary judgment, and Coburg concedes that it fired Dixon solely because he refused to remove the Confederate flag stickers from his tool box. Thus, causation is not an issue. The only question is whether the First Amendment protects Dixon's right to display the Confederate flag as he chose to display it.[2] Accordingly, the claim necessarily depends upon the resolution of a question of federal law.

---

[1] Under South Carolina law, an employer can usually discharge an employee "without incurring liability for good reason, no reason, or bad reason." *Culler v. Blue Ridge Elec. Coop., Inc.*, 422 S.E.2d 91, 92 (S.C. 1992). However, where the discharge of an employee violates "a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." *Ludwick v. This Minute of Carolina, Inc.,* 337 S.E.2d 213, 216 (S.C. 1985). The state supreme court, in *Culler*, held that this public policy rule applies when an employer violates S.C. Code § 16-17-560. The court reasoned, "We believe that *Ludwick's* prohibition of retaliatory discharge in violation of [a] clear mandate of public policy of this State extends at least to legislatively defined `Crimes Against Public Policy.'" *Culler*, 422 S.E.2d at 92-93.

[2] The Free Speech Clause of the First Amendment is mirrored in article 1, section 2 of the South Carolina Constitution, and the language of the state clause tracks the federal, constitutional language verbatim. As such, the South Carolina Supreme Court has held that its state constitution "affords the same protections as does the Federal constitution." *Charleston Joint Venture v. McPherson*, 417 S.E.2d 544, 548 n.7 (S.C. 1992).

7

The dissent, while conceding that "principles of federal First Amendment law still control the outcome of the case," would find that we lack jurisdiction based on a distinction "between the incorporation of a federal question into a state statute and the mere use of federal law principles, by way of analogy, to resolve an otherwise purely state-law question." *Post* at 26. Had the South Carolina legislature merely referenced federal law by way of analogy, as other states have done in the context of state anti-discrimination laws, *see post* at 26, or state antitrust laws, *see, e.g.*, *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 666 (Md. 1984) (holding that "decisions of the federal courts interpreting § 1 of the Sherman Act guide" the Maryland courts' understanding of the Maryland Antitrust Act), we would agree with the dissent that no federal issue would be present.

However, we do not read the South Carolina statute to support such a distinction, and in fact, Dixon concedes that "[f]ederal law is an element" of his cause of action under S.C. Code Ann. § 16-17-560. (Br. for Appellant, at 11.) Although it may be difficult to define the exercise of a First Amendment right in the abstract, there can be no doubt that this is precisely the type of analysis that the South Carolina legislature has intended courts to undertake. The statute makes it unlawful "for a person to . . . discharge a citizen from employment or occupation . . . because of political opinions or *the exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States.* . . ." S.C. Code Ann. § 16-17-560 (emphasis added). Federal law has not merely been referenced by analogy; it has been wholly incorporated into the statute, and made a critical element of a cause of action. For Dixon to prevail, he must prove that he has exercised a political right protected "by the Constitution and laws of the United States."

Reviewing the relevant South Carolina case law, we find additional support for this reading of the statute. In *Culler v. Blue Ridge Electrical Cooperative, Inc.*, 422 S.E.2d 91 (S.C. 1992), the Supreme Court of South Carolina first recognized that a discharged employee may sue his employer for violation of § 16-17-560. Based on the public policy exception to the at-will employment doctrine, the South Carolina court held that "if Culler was discharged because he refused to contribute to a political action fund, he would have a cause of action for wrongful discharge. . . ." *Id.* at 93. The *Culler* court's straightfor-

8

ward analysis is illustrative of its understanding that actions based on § 16-17-560 require a plaintiff simply to prove two elements: (1) whether the employee has articulated a political opinion or exercised a political right; and (2) whether the employee was discharged as a result.[3] In *Culler*, the court recognized that refusing to contribute to the PAC would satisfy the first element, but because Culler was not terminated for his refusal, his claim failed at the second step. *Id.* at 93.

Similarly, in *Moshtaghi v. The Citadel*, the Court of Appeals of South Carolina considered the claim of an adjunct professor who insisted that the military college "violated public policy through `reprisal for the exercise of rights of [Moshtaghi] protected by the Constitution of the State of South Carolina,'" specifically, his "constitutionally protected free speech rights" under the state constitution. 443 S.E.2d 915, 323 (1994) (alterations in original). As in *Culler*, the court assumed that Moshtaghi could satisfy the first prong because "[i]t is undisputed [that] the South Carolina Constitution provides for freedom of speech, of assembly, and the right to petition the government for redress of grievances." *Id.* However, the court dismissed Moshtaghi's claim at the second stage of its analysis because the trial court had found that "Moshtaghi was not terminated because of his involvement with the Board of Visitors election controversy." *Id.* at 323-24.

Additionally, this Court finds persuasive the reasoning of our colleague, Judge Shedd, in *Williams v. Strickland*, No. 3:92-515-19, 1993 WL 153915 (D. S.C. Mar. 12, 1993) (unpublished). In *Williams*, the district court considered a superficially complex ten-count complaint, alleging violations of both state and federal law. However, like the case currently before this Court, *Williams* essentially boiled down to a claim of wrongful discharge. Notwithstanding the presence of

---

[3] The dissent misunderstands our citation to *Culler*, erroneously believing that we equate Culler's articulation of a political opinion with Dixon's alleged exercise of a federally protected constitutional right. *Post* at 23-24. To clarify, we cite *Culler*, not to develop our understanding of First Amendment law, but rather, to support our reading that the South Carolina statute requires a plaintiff to meet the two-step test outlined above.

9

several state-law claims, the district court exercised federal jurisdiction over the entire case, and granted the defendant's motion for summary judgment on all counts.

In Count I of her complaint, Williams asserted a violation of her First Amendment rights to free speech and free association, "contend-[ing] that she was discharged because she [was] a Democrat." *Id.* at *1-*2. Judge Shedd found that Williams had "completely failed to offer any competent evidence in support of this claim." *Id.* at *2. Turning to Williams' contention that she had a cause of action under S.C. Code Ann. § 16-17-560, the court ruled, "While Williams is correct that she may maintain an action under *Ludwick* premised on the provision of Section 16-17-560, . . . her claim must nevertheless fail as a matter of law because of the Court's previous conclusion that she has failed to present sufficient evidence to support her claim that she was discharged for political reasons." *Id.* at *7 (citing *Culler*, 422 S.E.2d at 91).

In sum, like the *Culler*, *Moshtaghi*, and *Williams* courts, we believe that the South Carolina statute means exactly what it says. To support his claim under § 16-17-560, Dixon must first show that he exercised his constitutional right to free speech, and secondly, he must prove that he was discharged as a result. As explained above, causation is not an issue in dispute. Thus, this case turns solely on Dixon's allegation that his actions represented an exercise of his First Amendment right to free expression.

Following *Franchise Tax Board* and its progeny, we must next determine whether this federal question is substantial. *See Franchise Tax Bd.*, 463 U.S. at 13 (noting that "arising under" jurisdiction exists only if the state law claim "requires resolution of a *substantial* question of federal law") (emphasis added); *Mulcahey*, 29 F.3d at 151 (quoting *Franchise Tax Bd.*, 463 U.S. at 28). We find the question presented by Dixon's complaint to be substantial for three reasons.

Most obviously, Dixon's free speech claim raises First Amendment issues that are of monumental importance. Recently, the United States Supreme Court reviewed the Supreme Court of Virginia's affirmance of a state law prohibiting cross burning because of the vital First Amendment concerns at stake. *See Virginia v. Black*, ___ U.S. ___,

10

123 S.Ct. 1536, 1547 (2003). Similarly, Dixon's case presents this Court with a difficult question as to where the outer limit of an individual's right to political expression might lie.

Additionally, there "is an important need for uniformity in federal law" that supports this Court exercising jurisdiction over a state-law claim that necessarily turns upon an interpretation of the Bill of Rights. *Michigan v. Long*, 463 U.S. 1032, 1040 (1983).[4] That is, where a state statute, as applied, would rest exclusively on federal constitutional law, uniformity concerns must be taken into account. *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 347-48 (1816) (recognizing "the importance, and even necessity of *uniformity* of decisions throughout the whole United States, upon all subjects within the purview of the constitution") (emphasis in original). *See also Merrell Dow Pharmaceuticals v. Thompson*, 478 U.S. 804, 826 (1986) (Brennan, J., dissenting) (quoting *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.), at 347-48).

Lastly, the substantiality of these factors takes on additional importance because of a possible conflict with our Title VII jurisprudence. Pursuant to Title VII, Coburg maintains an obligation to furnish a harassment-free workplace. *See, e.g.*, *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (discussing the circumstances in which "an employer will be liable for a discriminatory environment that is otherwise actionably abusive"). Coburg claims that its actions were premised on its anti-harassment policy, and that it fired Dixon following a racial harassment allegation initiated by one of Dixon's co-workers.

---

[4] In *Long*, the Supreme Court ruled, in another context, that it had jurisdiction to consider a defendant's challenge of his state-court conviction on Fourth Amendment grounds when the "state court decision fairly appear[ed] to rest primarily on federal law, or to be interwoven with the federal law." 463 U.S. at 1040-41. The dissent mistakenly suggests that we cite *Long* to buttress our conclusion that the federal issue in the present case is sufficiently substantial to support a finding of federal question jurisdiction. The jurisdictional inquiry that we undertake is, as the dissent explains, unrelated to the jurisdictional question faced by the Supreme Court in *Long*. *See post* at 29 n.5. However, *Long*'s statement that there "is an important need for uniformity in federal law," is relevant to both analyses. Our citation to *Long* is simply for the purpose of acknowledging this fact.

11

Dixon argues that despite these Title VII concerns, South Carolina law should afford him far-reaching free speech protection. Dixon's suggested application of South Carolina law, of course, would put state and federal law directly in conflict with each other. For the employer, this conflict would mean either firing Dixon and facing a wrongful discharge claim, or ignoring the harassment complaint and facing Title VII liability. Plainly, our interest in resolving this issue is of paramount importance and further justifies our exercise of jurisdiction based on Count III.

Similarly, Count IV states a claim for "Retaliatory Discharge" based on Coburg's alleged attempt "to control the content of Plaintiff's right of free speech through constant and repeated efforts to get him to abandon his constitutionally protected rights of free speech by demanding that he remove the [Confederate] flag from his tool box and then, ultimately, terminating him for exercise of that same right. . . ." Essentially, Count IV rephrases the charge in Count III. As explained above, Coburg concedes that it pressured Dixon to remove the Confederate flag stickers from his tool box. Coburg further admits that it fired Dixon solely because he refused to adhere to this request. All that remains disputed, therefore, is whether Dixon's decision to display the Confederate flag was, as Dixon asserts, an exercise of "his constitutionally protected rights of free speech. . . ."

In sum, removal of Counts III and IV was proper pursuant to 28 U.S.C. § 1441(a) (2001), and removal of the supplemental state-law claims was proper pursuant to 28 U.S.C. § 1441(c) (2001).

## B.

Having determined that removal was permissible, this Court now considers whether the district court erred in dismissing Counts III and IV at the summary judgment stage.[5]

In Count III, Dixon alleges a violation of S.C. Code Ann. § 16-17-560, which provides the basis of a claim for wrongful discharge if an

---

[5] Count I, as explained above, is so frivolous and insubstantial that it fails to raise a federal question. Accordingly, that claim must be dismissed without prejudice.

12

employee is terminated for one of three reasons: (1) an exercise of "political rights" protected under federal law; (2) an exercise of "political rights" protected under state law; or (3) because of an individual's "political opinions."[6] Dixon does not allege a violation of the entire statute. Rather, he claims that he was discharged "for display of the Confederate flag," and he maintains that his employment was terminated because of his exercise of his constitutional right to free speech.[7] Nowhere does Dixon claim that he was discharged because of his "political opinions." Furthermore, this omission appears to have been intentional. Dixon notes that another co-worker, William Reid, "worked in the garage and also had a Confederate flag on his tool-box." (Br. for Appellant at 5.) Unlike Dixon, Reid agreed to remove his decal and continue working at Coburg. Both Dixon and Reid were motivated to display the flag because of their shared "political opinions." Neither, however, were fired because of their opinions about the flag issue. Rather, Dixon was discharged because of his alleged exercise of his First Amendment right to display the flag. As explained in the joint stipulation of facts, Coburg first asked Dixon to remove the Confederate flag from his tool box. When Dixon resisted, Coburg offered to purchase him a new tool box for the garage, suggesting that Dixon could keep his flag-adorned tool box for home use. Therefore, Dixon could have kept his job, not by changing his opinions, but by altering how he chose to express them.

The crux of the claim is whether Dixon's decision to display the

---

[6] As explained above, violation of this statute will support a civil cause of action for wrongful discharge under the public policy exception to the at-will employment doctrine. *See Culler v. Blue Ridge Elec. Co-op.*, 422 S.E. 2d 91 (S.C. 1992).

[7] S.C. Code Ann. § 16-17-560 states that it is "unlawful to discharge a citizen from employment because of the exercise of *political* rights and privileges guaranteed under the Constitution of the United States." (Emphasis added.) The statute does not embrace every constitutional right, but only those that can be labeled "political" rights and privileges. The Supreme Court of South Carolina has assumed, without deciding, that the exercise of the rights to "freedom of speech, of assembly, and the right to petition the government for redress of grievances" would be protected under § 16-17-560. *Moshtaghi v. The Citadel*, 443 S.E.2d 915, 919 (S.C. 1994).

13

Confederate flag is protected by the "political rights" language of S.C. Code Ann. § 16-17-560. A plain reading of the text of § 16-17-560 makes it clear that a court is to determine whether Dixon: (1) was engaged in the "exercise of political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State"; and (2) was discharged as a result. Because there is no dispute as to the reasons behind Dixon's discharge, the case turns on the question of whether there is any protection in the Free Speech Clause for Dixon's actions.

The act of displaying a Confederate flag is plainly within the purview of the First Amendment. "Flags, especially flags of a political sort, enjoy an honored position in the First Amendment hierarchy." *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 607 (4th Cir. 2001). Even more, Dixon chose to display the Confederate battle flag at a time when South Carolinians were vigorously debating whether that flag should fly atop their state capitol. As the Supreme Court recently affirmed, "The hallmark of the protection of free speech is to allow `free trade in ideas,'" and this protection extends "to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, ___ U.S. ___, 123 S.Ct. 1536, 1547 (2003). Dixon's actions, taking place amidst a charged political atmosphere, exemplify the kind of speech that the First Amendment was drafted to protect.

While Dixon may have a constitutional right to fly the Confederate flag, however, that right is not unlimited. An individual may not "exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972) (holding that the First Amendment does not protect the actions of a protester handing out anti-war handbills at a privately owned shopping mall when that mall has a policy against all handbilling). Had Dixon attended a pro-flag rally on the grounds of the state capitol, he clearly would have satisfied the first element of a claim under § 16-17-560. Assuming that state authorities would have permitted the rally to go forward, Dixon's attendance at such an event would be an exercise of his rights under the Free Speech Clause of the First Amendment. This conduct would be precisely the kind of speech that the South Carolina legislature wished to protect. Under South Carolina law, an individual who attended this type of rally on Sunday could not be fired by his private employer the

14

following Monday solely because his employer objected to the individual's presence at the rally.

Dixon, however, chose to display the Confederate flag on the tool box he used at his workplace. For Dixon to prevail, this Court would be required to find that the First Amendment gives him the right to move the flag rally from the capitol to the Coburg Dairy garage. Such a finding would lead to the absurd result of making every private workplace a constitutionally protected forum for political discourse. As the Supreme Court has observed, this argument "has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 47-48 (1967). The Court has "vigorously and forthrightly rejected" that concept of the First Amendment. *Id.* at 48.

Dixon has a constitutionally protected right to fly the Confederate battle flag from his home, car, or truck. He has a right to attend rallies on public property, and to march in events organized by the SCV. And under South Carolina law, he could not be discharged for exercising his First Amendment right at these events. In the context of this case, however, Dixon's First Amendment right does not extend to bringing the Confederate flag inside his employer's privately owned workplace. Dixon has failed to establish an essential element of a cause of action for wrongful discharge under S.C. Code Ann. § 16-17-560: that he exercised one of the "political rights and privileges guaranteed to every citizen by the Constitution and laws of the United States or by the Constitution and laws of this State." Thus, Coburg's motion for summary judgment as to Count III was properly granted.

The dissent takes issue with our understanding of the South Carolina statute, and instead suggests that the law should be interpreted to require a court to answer the hypothetical question of whether a private employer's actions would have violated the First Amendment if that employer were a state actor. This view of the South Carolina law is not based on South Carolina statutory or common law, as nothing in South Carolina's jurisprudence directs a court to ask what would have happened had Dixon been a government employee. Regardless, even were the dissent's interpretation of § 16-17-560 correct, a federal issue would still control — whether the First Amendment pro-

15

tects the right of a state employee to display the Confederate flag in the manner and circumstances in which Dixon displayed the flag. For the reasons stated below, we find that the protections of the First Amendment do not reach so far.

It is well-settled "that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). Thus, when an employee is discharged ostensibly for exercising his right to free speech, especially when that speech touches on a matter of public concern, the public employer bears the burden of justifying its personnel action based on its "interest in the effective and efficient fulfillment of its responsibilities" as an employer. *Id.* at 150.

Dixon alleges that he was discharged for refusing to remove two Confederate flag stickers from his tool box. He concedes, however, that Coburg would have bought him a new tool box and permitted him to keep the flags on his old tool box, so long as Dixon refrained from using the old tool box in the Coburg Dairy garage. When Dixon refused to accept this offer of compromise, he was fired.

Coburg justifies its decision to discharge Dixon based on its interest in preserving a friendly and efficient work environment. As explained above, whether to remove the Confederate flag from atop the state capitol dome was an extremely sensitive and divisive issue in South Carolina at the time. The flag was first raised over the capitol in 1962, just a few years before Congress passed the Civil Rights Act of 1964 and the Voting Rights Act of 1965. In its historical context, the decision to first fly the flag over the South Carolina capitol can reasonably be seen as a defiant act by a legislature determined to resist national pressure to desegregate. Although the State of South Carolina eventually capitulated in its fight against civil rights, the Confederate flag continued to fly until July 1, 2000.[8] In light of these

_____

[8] In fact, the flag still flies in South Carolina today. As part of a compromise between flag opponents and flag supporters, the state legislature agreed to remove the flag from the capitol dome and raise it elsewhere on the capitol grounds. Recognizing that the new position was in some

16

facts, it is easy to see how Dixon's decision to display the Confederate flag on his tool box would be viewed as a controversial and provocative act. In fact, Dixon's African-American co-worker, Leroy Garner, viewed Dixon's decision to display the flag inside the garage as a form of racial harassment. Not surprisingly, Coburg feared that any failure on its part in responding to Garner's concerns might expose the company to Title VII liability. Thus, in an effort to keep conflict among its employees at a minimum, in order to preserve a harmonious and efficient work environment, and in order to avoid any potential liability under federal anti-discrimination laws, Coburg asked that Dixon save his political statements for after work. Never did Coburg suggest that Dixon could not speak out about his views on the Confederate flag. Instead, Dixon's employer merely insisted that he voice those viewpoints in a manner that would be less likely to goad one of his co-workers into an emotional confrontation. This is surely a substantial and legitimate interest that supports Coburg's actions. *See Black*, 123 S.Ct. at 1547 (noting, "The protections afforded by the First Amendment . . . are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution.").

When a public employee has been discharged for allegedly exercising his First Amendment right to free speech, "Our responsibility is to ensure that [the employee is] not deprived of fundamental rights by virtue of working for the government. . . ." *Id.* at 147. That is, the public employee should enjoy the same level of constitutional protection as does the private employee. A state employer need not go farther than a private employer, however, and provide its employees with an unrestrained forum for political discourse in the work environment. Because Coburg went to great lengths to protect Dixon's right to speak freely outside of the workplace, Dixon's First Amendment right to free speech has not been infringed by his discharge

---

ways more objectionable, some flag supporters chanted "Off the dome and in your face" as NAACP advocates and Sons of Confederate Veterans witnessed the flag being moved to its new site in front of the capitol at a prominent intersection in downtown Columbia. *See* "Confederate Flag Removed from S.C. Statehouse," *Los Angeles Times*, July 2, 2000, at A18.

17

based on his actions inside the garage. Coburg is therefore entitled to summary judgment on Count III.

In Count IV of his complaint, Dixon alleges a cause of action for retaliatory discharge. According to Dixon, "Coburg's actions, through its agents['] attempts to control the content of Plaintiff's right of free speech . . . and then, ultimately terminating him for exercising that same right, constitute retaliatory discharge of Plaintiff." As discussed above, based on the facts of this case, Dixon's placement of the Confederate flag on his tool box was not a constitutionally protected exercise of free speech. Therefore, the district court properly dismissed this claim on summary judgment as well.

### C.

The Court now turns to the question of whether Coburg was entitled to summary judgment on Dixon's six pendent state-law claims. Specifically, this Court must determine whether Coburg is entitled to summary judgment as to Counts VI, VII, VIII and IX of Dixon's complaint.[9] Dixon's argument on these remaining claims, in its entirety, is as follows:

> Finally, the District Court failed to address Dixon's argument that his causes of action based on other aspects of South Carolina law, including breach of contract, defamation, intentional infliction of emotional distress and conspiracy are fact driven theories which should not be determined on motion for summary judgment. Dixon submits that genuine issues of fact exist with regard to these causes of action, which should only be determined at the trial level.

(Br. for Appellant at 29.) In point of fact, however, Dixon never does submit what these genuine issues of material fact might be. He has failed to allege any facts, either before this Court or the district court, to support his allegations of breach of contract, civil conspiracy, defamation, or intentional infliction of emotional distress. This is so

---

[9] The district court also granted summary judgment on Counts II and V of Dixon's complaint. Dixon, however, has not appealed the district court's ruling on these counts.

18

because Dixon's case is not really about any of these state-law claims. Rather, Dixon's allegations rise or fall solely on his free speech allegations, discussed above. As such, the district court rightly granted Coburg's motion for summary judgment on the pendent state-law causes of action.

## IV.

For the foregoing reasons, the district court's ruling is affirmed in part and reversed in part. As explained above, Coburg is entitled to summary judgment on Counts II through IX of Dixon's complaint. Count I, premised on a violation of constitutional rights, is so wholly insubstantial and frivolous as to fail to raise any federal question. Accordingly, that purportedly federal count is dismissed without prejudice.

*AFFIRMED IN PART, REVERSED IN PART*

GOODWIN, District Judge, concurring in part and dissenting in part:

The majority concludes that Counts III and IV of the plaintiff's complaint necessarily depend on the resolution of a substantial question of federal law, and thus that federal question jurisdiction exists over those counts. I respectfully disagree. First, I conclude that Dixon's wrongful discharge and retaliatory discharge claims do not depend on the resolution of any question of federal law. Second, even if I were to conclude that those claims do depend on the resolution of a question of federal law, that question is not a substantial one. For both of these independently sufficient reasons, I would hold that the district court lacked jurisdiction over Counts III and IV. I concur in the majority's opinion insofar as it holds that Count I of the complaint raises an insubstantial question of federal law. Because none of the counts give rise to federal question jurisdiction, the district court lacked any basis for exercising supplemental jurisdiction over the state-law counts. Accordingly, the entire complaint should be dismissed for lack of jurisdiction. Because I believe we lack jurisdiction, I do not reach the merits of Dixon's claims.

## I.

The majority concludes that the district court had federal question jurisdiction in this case, holding that Count III "necessarily depends

19

upon the resolution of a question of federal law." *Ante* at 7. In reaching this conclusion, the majority notes that in order to prevail Dixon must establish that he "exercised a political right or privilege that is `guaranteed to every citizen by the Constitution and laws of the United States . . . .'" *Ante* at 7. I agree. I also agree with the majority's observation that causation is not in dispute, and that "[t]he only question is whether the First Amendment protects Dixon's right to display the Confederate flag as he chose to display it." *Ante* at 7. From this, the majority concludes that Dixon's claim depends on the resolution of a question of federal law.

At first blush, this conclusion appears to be correct. If, as I agree is the case, the only real question here is whether Dixon was exercising his First Amendment rights when he displayed the flag in the manner that he did, then it might seem obvious that the outcome of this case depends on the resolution of a question of federal law.[1] However, in the circumstances of this case, the question of "Was Dixon exercising his First Amendment rights?" is not a question that can be answered under federal law. This is because, under federal law, one cannot determine whether a specific expressive activity is an "exercise of First Amendment rights" without reference to a state actor who is trying to suppress that expressive activity. Here, of course, no state actor was involved in Dixon's discharge. Accordingly, there is no body of federal law that addresses the question of whether Dixon was exercising his First Amendment rights. Rather, the concept of the "exercise of First Amendment rights" in the context of solely private action is a concept that has been created by the South Carolina legislature. It is a state law concept that does not exist under federal law. Undoubtedly, the South Carolina legislature intended that federal law interpreting the First Amendment would be used, by way of analogy, to determine when an individual was, in a manner of speaking, exercising his First Amendment rights in the private employment context. But there is a critical difference between incorporating a question of federal law into a state statute and using federal

---

[1] Indeed, as the majority points out, *ante* at 8, Dixon believes that the First Amendment issues in this case form an element of his state cause of action. Of course, a party's concession cannot provide federal question jurisdiction where it would otherwise be lacking. *See Mescalero Apache Tribe v. New Mexico*, 131 F.3d 1379, 1386 (10th Cir. 1997).

20

law as a reference or analogy for interpreting a purely state law cause of action.[2] Here, South Carolina has done the latter, and thus there is no federal question jurisdiction under this statute.

## A.

Colloquially, we often speak of exercising our federal constitutional rights, for example, exercising our right to free speech. In the abstract, though, it is impossible to say whether a particular form of expression, like displaying the Confederate flag, is or is not an exercise of First Amendment rights. The scope and nature of First Amendment rights depends on the circumstances of the expression in question and — most critically for present purposes — the nature of the *state's* attempt to restrict it. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985) (explaining that the types of restrictions the state may place on speech depend on whether the speaker wishes to speak in a public forum, a limited purpose public forum, or a nonpublic forum). The First Amendment does not provide individuals with a generalized right to express themselves without interference from others — it only places certain limits on attempts by the *state* to interfere with expressive activity. *See CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973) ("That `Congress shall make no law . . . abridging the freedom of speech, or of the press' is a restraint on government action, not that of private persons."). Moreover, the First Amendment only prohibits the state from interfering with speech in certain ways, and in certain contexts. Unless we know how the state is attempting to restrict an expressive activity, it is impossible to say whether the individual engaged in that expressive activity is "exercising his First Amendment rights."

I will illustrate by way of example. The majority claims that if Dixon were to display the Confederate flag during a pro-flag rally on the grounds of the state capitol, that action would clearly constitute an exercise of his First Amendment rights. *Ante* at 14. I disagree —

---

[2] Of course, even in cases where the state statute does incorporate a question of federal law, federal question jurisdiction is often not present. *See Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 809 (1986); *infra* Part II. The point here is that federal question jurisdiction is *never* present when federal law is used merely by analogy.

21

flag-waving at a pro-flag rally on state capitol grounds does not always constitute an exercise of First Amendment rights. The majority's example activity — no doubt chosen because it seems a paradigmatic example of exercising one's First Amendment rights — could be prohibited by the state in some circumstances. For example, the state could prohibit a pro-flag rally at 2 a.m. pursuant to a uniformly-applied policy against assembly on capitol grounds between midnight and 6 a.m. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322 (2001) (state may impose "content-neutral time, place, and manner regulation of the use of a public forum"). Similarly, the state could prohibit a pro-flag rally on the capitol grounds planned for a given day in light of a credible bomb threat associated with that rally. *See Thomas v. Collins*, 323 U.S. 516, 532 (1945) (state may impose a prior restraint on speech "if grave and impending public danger requires this"). In some circumstances, the government could even fire an employee for participating in an otherwise constitutionally-protected pro-flag rally on the capitol grounds. Imagine that a pro-flag citizen group had brought a lawsuit challenging the process by which the South Carolina legislature decided to remove the Confederate flag from atop the statehouse, and planned a rally to publicize the case and their cause. A law clerk to the judge assigned the case wishes to attend the pro-flag rally, as he strongly supports flying the flag atop the capitol. Surely the judge could, consistent with the First Amendment, prohibit the clerk from attending the pro-flag rally in order to prevent any appearance of judicial bias or impropriety, and in fact could fire the clerk if he disobeyed and attended the rally anyway. *See* Judicial Conference of the United States, *Code of Conduct for Judicial Employees*, Canon 2 (1995) *available at* <http://www.uscourts.gov/guide/vol2/ch2a.html> ("A judicial employee should not engage in any activities that would put into question the propriety of the judicial employee's conduct in carrying out the duties of the office."); *id.* Canon 5.B ("[A] judicial employee[ ] may engage in nonpartisan political activity only if such activity does not tend to reflect adversely on the dignity or impartiality of the court or office and does not interfere with the proper performance of official duties."). A complaint from the clerk that his discharge violated the First Amendment, because he was exercising his First Amendment rights, would almost assuredly fall on deaf ears.

As these examples hopefully make clear, even for conduct that seems to typify freedom of expression, the question of whether that

22

conduct constitutes the exercise of one's First Amendment rights cannot be answered without knowing the manner and justification for state restrictions on that speech. The majority concedes that it is "difficult" to determine, in the abstract, when an individual is exercising his First Amendment rights. *Ante* at 8. Here, I think, lies the heart of our disagreement. I do not find this task merely difficult; I find it impossible — at least under federal law.

The majority states that "there can be no doubt" that defining the exercise of First Amendment rights in the abstract "is precisely the type of analysis that the South Carolina legislature has intended courts to undertake." *Ante* at 8. But whether one concludes that the South Carolina legislature intended courts to determine the exercise of First Amendment rights by defining those rights in the abstract, as the majority asserts, or by treating the private employer as if it were a state actor, as I have asserted, in neither case is the court determining a question of federal law. Just as there is no body of federal law that defines the exercise of First Amendment rights as against a private employer, there is no body of federal law defining it in the abstract.

If the majority's interpretation of the South Carolina statute is correct — that is, if the statute asks courts to determine the exercise of First Amendment rights in the abstract, rather than by treating the private employer as a state actor — then the statute has less to do with federal law than under my interpretation. The majority argues that under *Culler*, the analysis of whether the plaintiff was exercising a First Amendment right is simply "whether the employee has articulated a political opinion or exercised a political right." *Ante* at 9. Under this approach, the phrase "exercise of First Amendment rights" is treated as a shorthand reference to political expression. If this is how the South Carolina courts interpret the statute, then its reach is broad indeed — much broader than the protection afforded public employees by the First Amendment. Applying this test to the case at hand, it is hard to see why the majority concludes that Dixon was not exercising a First Amendment right. After all, his display of the Confederate flag was intended by him, and understood by others, as the articulation of a political opinion. His employer asked that he limit his

23

advocacy of his political opinion about the Confederate flag to outside the workplace. He refused, and he was fired.[3]

Because no state actor was involved in Dixon's discharge, there is no body of federal law that answers the question of whether Dixon was exercising his First Amendment rights in this case. The question embedded in the South Carolina statute — when is an individual exercising his First Amendment rights as against his private employer — is simply not a question of federal law. Because Dixon's claims do not depend on the resolution of a "question of federal law," these claims do not give rise to federal jurisdiction.

B.

Thus far, I have argued that the concept of the "exercise of First Amendment rights," in the absence of state action, is a concept that has no content under federal law. It might seem to follow that this part of the South Carolina statute, which regulates private action as against the exercise of First Amendment rights, is simply a nullity. After all, if there is no such thing, under federal law, as the exercise of First Amendment rights absent state action, then one could argue that this part of the statute can have no meaning, at least as applied to private actors. This was the district court's conclusion. It granted summary judgment to Coburg, explaining that under the federal constitution, "for there to be a violation of free speech, there must be state action. . . . [T]here was no state action in this case. That being the case, . . . the defendant had an absolute right to discharge the plaintiff." I agree that the district court's interpretation is one plausible construction of the statute, albeit one that renders the statute a nullity as against private actors. However, there is another way to interpret the statute that does give it meaning.

While the concept of the "exercise of First Amendment rights" absent state action has no content under *federal law*, it is an entirely different question whether it might have some content under *state*

---

[3] As to whether Dixon "exercised a political right," I am not sure what this phrase might mean except the exercise of his rights under the First Amendment, a concept that I have already argued is, in the absence of state action, without content under federal law.

24

*law*. Undoubtedly, the South Carolina legislature intended that this part of the statute would have some meaning. I can conceive of one way to interpret the statute that does give it meaning. To determine whether the South Carolina private employer has acted "because of [an employee's] . . . exercise of" his First Amendment free speech rights, a court should ask whether the private employer's actions would have violated the First Amendment if it were a state actor. If so, then one can say, in a manner of speaking, that the private actor has discharged the employee because of the employee's exercise of his First Amendment rights.[4] Critically, this concept — that a private

---

[4] The majority is skeptical of this approach to the statute, contending that it has no basis in the statute or South Carolina common law. While I concede that this interpretation is not compelled by the text of the statute, I submit that it is the best interpretation because it is (1) consistent with the text of the statute and (2) the only way, as far as I can tell, to give the statute any force. By making it a crime for a private employer to discharge an employee for the exercise of his First Amendment rights (among other things), the South Carolina legislature intended, I believe, to afford the same protection to private employees as against their private employers as is enjoyed by public employees against the state. (There are reasons to doubt whether doing so is wise or even, in some circumstances, constitutional, but those issues are not before the court. *See* Julian N. Eule & Jonathan D. Varat, *Transporting First Amendment Norms to the Private Sector: With Every Wish There Comes a Curse*, 45 U.C.L.A. L. Rev. 1537, 1605-32 (1998) (suggesting that applying First Amendment-type restrictions to private actors may, in certain circumstances, violate those actors' First Amendment freedom of expression and association rights).) By using the phrase "exercise of [the employee's First Amendment] rights," it seems that the South Carolina legislature intended to protect private employees' rights to express themselves on political and other important matters in the private workplace. And by making reference to political rights protected under the United States Constitution rather than simply using a phrase like "expressing political beliefs," the South Carolina legislature clearly had in mind the body of federal caselaw that has developed related to First Amendment restrictions on state action. I have argued above that it is impossible to say whether a given act of expression is an exercise of First Amendment rights without knowing the context of the speech and the manner of the government's attempt to restrict it. Accordingly, the only way that I can conceive to apply, to private actors, the body of federal caselaw governing First Amendment protections against state action, is to treat the private actor as if it were a state actor.

25

employee can be "exercising First Amendment rights" as against his private employer — is a *state law* concept, one that the South Carolina legislature has created, not incorporated from federal law. It could not have incorporated this concept from federal law, because the concept does not exist under federal law. It is a new creation of the South Carolina legislature and is purely a creature of state law.

The majority argues that even if it were to adopt this approach to the statute, "a federal issue would still control — whether the First Amendment protects the right of a state employee to display the Confederate flag in the manner and circumstances in which Dixon displayed the flag." *Ante* at 15-16. I agree with the majority that, even under my approach to the statute, principles of federal First Amendment law still control the outcome of the case. This does not mean, however, that the statute has incorporated a *question* of federal law. The difference, I submit, is between the incorporation of a federal question into a state statute and the mere use of federal law principles, by way of analogy, to resolve an otherwise purely state-law question. Here, the South Carolina statute does not incorporate a federal question, because the exercise of First Amendment rights absent state action is a concept alien to federal law. Instead, the South Carolina statute has created a new state-law concept — the exercise of First Amendment rights outside the context of state action — which is given content by looking to federal First Amendment law, in the context of state action, by way of analogy.

---

Moreover, while this approach is not laid out explicitly in the statute or in South Carolina caselaw (which is relatively undeveloped in this area at this time), the approach does find support in caselaw from Pennsylvania and Connecticut interpreting analogous state statutes. To determine whether a private employee was discharged by a private employer for "exercising a First Amendment right," courts have relied on federal caselaw related to the discharge of *public* employees. *See Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 898-901 (3d Cir. 1983) (interpreting Pennsylvania law); *Winik-Nystrup v. Mfrs. Life Ins. Co.*, 8 F. Supp. 2d 157, 160 (D. Conn. 1998) (interpreting Connecticut law). In essence, these courts ask whether, if the private employer had been a state actor, the employee's discharge would have violated the First Amendment. *See id.*

26

The role of federal law in this case is similar to the use of federal law in cases where state courts interpret purely state-law statutes in light of similar federal statutes. For example, some state courts have interpreted state anti-discrimination laws in accordance with the principles of federal anti-discrimination law. *See, e.g.*, *Barefoot v. Sundale Nursing Home*, 457 S.E.2d 152, 159 (W. Va. 1995) ("We have consistently held that cases brought under the West Virginia Human Rights Act, W.Va.Code, 5-11-1, *et seq.*, are governed by the same analytical framework and structures developed under Title VII, at least where our statute's language does not direct otherwise." (citations omitted)). While cases involving these state laws are sometimes resolved by considering and analyzing the analogous federal law, such cases do not depend on the resolution of a *question* of federal law that was incorporated into the statute. As one district court in this circuit has explained, "[t]he situation . . . where a plaintiff asserts a claim for recovery under a state statute that is modeled after federal law[ ] should be distinguished from the situation in which a plaintiff asserts a claim that incorporates a federal statute or standard as an element of recovery under state law." *Pendergraph v. Crown Honda-Volvo, LLC*, 104 F. Supp. 2d 586, 589 (M.D.N.C. 1999). The former case, where the court looks to federal law simply for a framework to decide a state law question, does not give rise to federal question jurisdiction. *See id.* ("[T]he mere fact that a local ordinance is construed in accordance with a federal statute does not give rise to federal question jurisdiction. . . . Clearly, the state or local government's decision to look to federal law for guidance in interpreting state law does not federalize the cause of action."); *Mixer v. M.K.-Ferguson Co.*, 17 F. Supp. 2d 569, 572 (S.D. W. Va. 1998) (holding that claim under West Virginia Human Rights Act did not present a federal question). In this case, the fact that a state law claim requires analysis of federal law and depends on resolving an issue of federal law does not mean that the state claim has incorporated a question of federal law. Federal law simply provides the analytical framework for deciding a purely state law question.

Accordingly, Dixon's claims that rely on the South Carolina statute (in combination with the public policy exception to the at-will doctrine) do not "depend[ ] on the resolution of a . . . question of federal law." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). The question of whether Dixon was exercising his

27

First Amendment rights in this case cannot be answered by federal law because there is no state action against which to measure First Amendment protections. However, the question can be answered under state law — specifically, under the state law concept created by the South Carolina legislature that a private employee can be said to be exercising his First Amendment rights, for purposes of this state statute, when he is fired under circumstances which, if his private employer were a state actor, would violate the First Amendment. Because Dixon's claims in Counts III and IV do not depend on the resolution of a question of federal law, those claims do not give rise to federal question jurisdiction.

## II.

Even assuming for the sake of argument that Counts III and IV do depend on the resolution of a question of federal law, I nonetheless believe that such a question is not substantial. This provides another, independently sufficient reason for my conclusion that the district court lacked jurisdiction in this case.

The majority first decides that Dixon's claim "necessarily depends upon the resolution of a question of federal law." *Ante* at 7. Assuming that these claims raise a federal question, I agree with the majority that Dixon's claims here necessarily depend on the resolution of that question. The Supreme Court has made clear, however, that federal question jurisdiction is not always present in cases involving a state law that incorporates a federal question as an element of the state claim, even when resolution of that federal question is the central issue in the case. In *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), the Supreme Court noted that "the central issue presented in [*Franchise Tax Board of the State of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1 (1983)] turned on the meaning of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1982 ed. and Supp. III), but we nevertheless concluded that federal jurisdiction was lacking." *Merrell Dow*, 478 U.S. at 809. Noting, among other things, that no free-standing federal cause of action was available to the plaintiff, the Court concluded that "the presence of a claimed violation of the statute as an element of the state cause of action is insufficiently `substantial' to confer federal-question jurisdiction." *Id.* at 814.

28

The determination of whether the federal question in this case is "substantial" "should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic." *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 806 (4th Cir. 1996). "At bottom, we must determine whether the dispute is one that Congress intended federal courts to resolve, taking into account the historical reasons for establishing federal courts." *Id.* (citing *Merrell Dow*, 478 U.S. at 826-27 (Brennan, J., dissenting)). Those reasons for establishing the federal courts include interests in uniform national interpretation of the law, *Merrell Dow*, 478 U.S. at 826 (Brennan, J. dissenting), and the possibility of greater expertise of federal courts in questions of federal law, *id.* at 826-27. In addition, the majority in *Merrell Dow* considered whether the plaintiff had a free-standing cause of action under the federal law in question. *Id.* at 813-14.[5]

Applying these pragmatic principles to the federal question arguably implicated in this case, I conclude that they all point toward finding that the federal question, if any, is not substantial. As for national uniformity, the particular federal law question raised in this case —

---

[5] The majority, in its discussion of whether this federal question is "substantial," quotes a statement from *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983), to the effect that the Supreme Court has jurisdiction to review a "state court decision [that] fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Ante* at 11 n.4. This standard relates to the scope of the Supreme Court's powers to review state court judgments, specifically regarding whether the state court decision rests on an adequate and independent state law ground. It does not, I submit, have any bearing on whether a question of federal law embedded in a state cause of action is substantial so as to give rise to original jurisdiction in the district courts. The two concepts are quite different, and *Long*'s statement about the former does not assist in determining the latter. The Supreme Court routinely reviews state court decisions containing federal issues that do not give rise to federal question jurisdiction in the district courts. For example, the existence of a federal defense in a state cause of action does not give rise to original jurisdiction in the district courts, but does provide a basis for Supreme Court review of a state court judgment. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (reviewing First Amendment defense to state libel action).

29

when is a private employee exercising his First Amendment rights as against his private employer — is limited to the specific context of this type of state statute. Because the First Amendment does not apply to private employers, determining when a private employer can be said to have fired an employee because of his exercise of his First Amendment rights only has implications for other cases brought under this South Carolina statute (or an analogous state statute), not for First Amendment cases generally. As for the relative expertise of federal and state courts, the First Amendment is an area of federal law in which state courts are well versed. State courts, as courts of general jurisdiction, must routinely decide issues that implicate the First Amendment, for example when the First Amendment is asserted as a defense to a state claim. *See, e.g.*, *Goodwin v. Kennedy*, 552 S.E.2d 319, 324-25 (S.C. Ct. App. 2001) (discussing First Amendment principles that limit state libel actions); *Parker v. Evening Post Pub. Co.*, 452 S.E.2d 640, 644 (S.C. App. Ct. 1994) (same).

In addition, the majority in *Merrell Dow* placed great emphasis on the fact that no free-standing federal cause of action was available to the plaintiff for the federal statute that had been incorporated into the state cause of action at issue. The court explained that:

> The significance of the necessary assumption that there is no federal private cause of action thus cannot be overstated. For the ultimate import of such a conclusion, as we have repeatedly emphasized, is that it would flout congressional intent to provide a private federal remedy for the violation of the federal statute. We think it would similarly flout, or at least undermine, congressional intent to conclude that the federal courts might nevertheless exercise federal-question jurisdiction and provide remedies for violations of that federal statute solely because the violation of the federal statute is said to be a "rebuttable presumption" or a "proximate cause" under state law, rather than a federal action under federal law.

*Merrell Dow*, 478 U.S. at 812 (footnote omitted). In this case, of course, Dixon has no federal cause of action against Coburg under the First Amendment or § 1983, because Coburg is not a state actor. Thus, we are presented with a case where no free-standing federal

30

cause of action exists for the federal right asserted here (if it is a federal right at all), a factor whose significance "cannot be overstated." *Id.*[6]

Considering all of the factors in this case, I cannot conclude that this case falls within that "small class of cases where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331." *Ormet*, 98 F.3d at 806. The South Carolina courts, like all state courts, have much experience interpreting and applying the First Amendment. Moreover, even assuming that the statute does incorporate a question of federal First Amendment law, the South Carolina statute asks the court to apply those First Amendment principles in an entirely novel context — as against a private employer. The majority makes reference to "First Amendment issues . . . of monumental importance" in this case. *Ante* at 10. On the contrary, I would argue that there are *no* First Amendment concerns at stake, for the First Amendment has nothing to say about the acts of private employers. Rather, the concern at stake here is free speech rights of private employees as against their private employers, a concern created by the South Carolina legislature but not present in the United States Constitution. Given this unique creation of South Carolina law, there is no need for national uniformity in this area, and South Carolina

_____

[6] Indeed, given the tone of the language in *Merrell Dow*, one could be excused for concluding that *Merrell Dow* had established a categorical rule that when there is no free-standing federal cause of action, federal question jurisdiction never exists over a state cause of action that incorporates that federal standard. The Supreme Court's conclusion in *Merrell Dow* makes this factor sound dispositive: "We conclude that a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim arising under the Constitution, laws, or treaties of the United States." *Merrell Dow*, 478 U.S. at 817 (quotations and citation omitted). Nonetheless, this court in *Ormet* concluded that "[t]here is a small class of cases where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331." *Ormet*, 98 F.3d at 806.

31

state courts are better equipped to interpret and apply this statute. In sum, I would hold that even if the First Amendment principles implicated by the South Carolina statute can be said to present a "question of federal law," that question is not "sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331." *Ormet*, 98 F.3d at 806.

The majority holds that the federal issue here is substantial not only because of the First Amendment issues implicated, but also "because of a possible conflict with our Title VII jurisprudence." *Ante* at 11. Any conflict with Title VII, however, would arise as a federal defense to the plaintiff's claims, and as such is insufficient to confer federal question jurisdiction. *See Merrell Dow*, 478 U.S. at 808 ("A defense that raises a federal question is inadequate to confer federal jurisdiction." (citation omitted)). The majority does not claim that possible conflict with Title VII is itself sufficient to provide federal question jurisdiction, but rather asserts that the existence of a significant federal defense is relevant to whether the federal question embedded in the state statute is substantial. However, the substantiality *vel non* of a question of federal law embedded in a state cause of action is not affected by other factors, such as a possible federal defense, that are unrelated to the federal question itself. Certainly the Court in *Merrell Dow*, which repeated the well-established principle that federal defenses are inadequate to confer federal jurisdiction, *id.*, made no suggestion that federal defenses might nonetheless be relevant to the substantiality of the question of federal law presented in the state cause of action. Nor can I find any decision in which a court considered the existence of a possible federal defense when determining the substantiality of a question of federal law. Here, we are simply asked to determine whether the First Amendment issues implicated by the South Carolina statute are sufficiently substantial to give rise to federal question jurisdiction. The existence of a Title VII defense is irrelevant to that determination.

### III.

In sum, I conclude that the First Amendment principles implicated by Counts III and IV of Dixon's complaint do not constitute a question of federal law. In the alternative, even if Counts III and IV do depend on the resolution of a question of federal law, that question

32

is not sufficiently substantial to give rise to federal jurisdiction. Finally, I conclude that the existence of a federal defense to these claims has no bearing on whether any question of federal law presented is substantial. I agree with the majority that the federal question presented in Count I is insubstantial, and concur in the judgment insofar as it dismisses Count I for lack of jurisdiction. As to the remaining counts, I would reverse the district court's judgment and remand for dismissal for lack of federal jurisdiction.