Karen Renee **AUGUSTUS** et al.,
Plaintiffs,

v.

**SCHOOL BOARD OF ESCAMBIA
COUNTY** et al., **Defendants.**

**No. PCA 1064.**

United States District Court,
N. D. Florida,
Pensacola Division.

July 24, 1973.

Drew S. Days, III, New York City, Norman J. Chachkin, New York City, for plaintiffs.

Edward T. Barfield, Pensacola, Fla., Leon L. Porter, Jr., Semmes Luckett, Clarksdale, Miss., for defendants.

Ed Duffee, Jr., Tallahassee, Fla., for plaintiff-intervenors.

Mark R. Hawes, Tampa, Fla., for defendant-intervenors.

## MEMORANDUM DECISION

ARNOW, Chief Judge.

This matter is before the Court on intervenors' application to make permanent this court's preliminary injunction issued January 24, 1973. The original action in this suit was filed in 1960 to require the school board of Escambia County, and other school officials, to reorganize the school system on a unitary, non-racial basis. The court retained jurisdiction of the matter in order to effectuate its orders. The present facet of this action was initiated by Marenda Kyle on behalf of her daughter, Belinda Jackson, and all others similarly situated, seeking intervention. This class was later defined as all black students attending Escambia High School, and the court allowed them to intervene. They are referred to herein as plaintiff-intervenors. The original plaintiffs in this suit took no active part in this phase of this litigation. They did, through their attorneys, file a pleading in which they stated they supported the position of the plaintiff-intervenors.

The complaint alleged that Escambia High School's use of the name "Rebels" as its official name, its use of the Confederate Battle Flag as a school symbol, and the singing of "Dixie" at school functions deprived plaintiffs of their rights, privileges, and immunities secured by the Fourteenth Amendment. Specifically, plaintiff-intervenors alleged that the use of these symbols represented symbolic resistance to this court's order requiring the maintenance of a unitary school district, that the symbols generated a feeling of inequality and inferiority among the black students, and that the symbols were a cause of violence and disruption in the school. The complaint sought preliminary and permanent injunction against their further use by either the school or individual students attending the school. The defendants have not denied the use of the symbols, but have taken the position that the student body has the right to choose its own symbols.

At the hearing to determine whether a preliminary injunction should issue, the plaintiff-intervenors, when confronted with Florida Statute § 230.222, F.S.A. dropped their request for injunctive relief against the singing of "Dixie." After taking evidence, the court found the use of the other symbols had become a symbol of white racism in general and offensive to a substantial number of black students. The court further found the wearing of the Confederate Battle Flag by white students was being done deliberately and for the purpose of offending black students. The court issued a preliminary injunction enjoining the defendant School Board from displaying the Confederate Battle Flag at Escambia High School, from permitting the name "Rebels" to be used as the school identification, and from permitting any student from displaying or wearing on his person the Confederate Battle Flag, while at attendance at the school or any activity sponsored or organized by it. In the original order and in a supplemental order dated January 26, 1973, certain exceptions to the prohibition against the use of symbols were granted. These exceptions consisted of prior monuments, plaques, trophies, yearbooks, class rings and the gymnasium floor which bore inscriptions of the Confederate Battle Flag or the word "Rebels."

After the issuing of the preliminary injunction, Nicky D. Scapin and others intervened on behalf of the residents and taxpayers of Escambia County as well as all students at Escambia High School. Their complaint alleged they had not used any of the disputed sym-

bols in the manner designated by the court in its order dated January 24, 1973, and that, therefore, they were denied rights guaranteed them by the First and Fourteenth Amendment. Their motion to intervene was not opposed and was granted in an order dated February 20, 1973. Although their intervention placed them technically in the role of plaintiffs, their position was essentially that of the defendants. At the final hearing, they agreed to align themselves with the defendants, and in this opinion they will be referred to as the defendant-intervenors so as to avoid confusion.

Prior to the final hearing, the parties agreed to many factual matters. The following matters were stipulated: Prior to the 1966–67 school year, Escambia High School was attended only by white students. Prior to the 1970 school year, a few black students attended the school, but a substantial increase in black enrollment occurred in 1970 when 349 blacks enrolled (approximately 11% of the total enrollment); thereafter, the black enrollment decreased somewhat. During the 1972–73 school year, there were 252 black students and 3,088 white students attending Escambia High School.

It was further stipulated that there was racial tension during the last school year. Major disturbances broke out on November 15, 1972; December 16, 1972; January 31, 1973; and March 22, 1973. During these disturbances, there was considerable inter-racial fighting, and the school was closed on two occasions. In addition to major confrontations occurring on these days, disruptions and walkouts occurred on several other occasions. The State Patrol was required to maintain order for a period in early February, 1973. Several meetings were held within the community to discuss the situation.

It is undisputed that the symbols were used by the school as symbolic designations for the school and that such official use was the responsibility of the defendant School Board. The symbols originated with the inception of the high school in 1958 and were chosen by student vote. The School Board authorized an additional student vote on the symbols on January 16, 1973. The results supported the continued use of the symbols by a large majority.[1] No record was made of the racial composition of the vote.

It is clear from the evidence that since the black demands for the abolition of the Confederate symbols were announced in the fall of 1972,[2] the symbols became a principal focus of the dispute and were a source of considerable racial tension. It is also clear that there were other racial irritants, both prior to, and after the symbols became a major issue.

It is also clear from the evidence that, after the initial confrontation broke out, some white students used the symbols as a means of irritating and provoking black students. There was agreement, and it is undisputed, that unidentified young people would drive around the school honking horns and waving the Confederate Battle Flag. There was testimony from both sides that blacks were not taking part in school activities to the full extent possible. This lack of participation, according to witnesses for plaintiff-intervenors, was a result of racial hostility and of the school's use of the disputed symbols. A witness for defendant-intervenors testified lack of participation was due to a feeling of apathy among many of the black students. There was testimony that some blacks had been elected to positions of leadership in the school.

There was disagreement among the parties as to whether the symbols were an actual or feigned irritation. The

1. Testimony indicated the results of the election were a foregone conclusion.

2. The exact timing of these demands was in dispute. Plaintiffs alleged that re-

quests were made at the beginning of the school year. Defendants' testimony places the demands in November, 1972.

**386**

plaintiff witnesses were unanimous in stating that the symbols reminded them of slavery and white dominance. The defendant witnesses were divided on the issue. One of the School Board's witnesses was Mr. Leeper, a member of the School Board and a principal mediator in the dispute. He stated that he felt the symbols could be irritating to blacks, but that this, he believed, resulted from the School Board's failure to educate the students properly on the meaning of the symbols. His position on irritation is also set forth in a statement made by him at a board meeting held on January 5, 1973:

> Mr. Leeper: "We realize . . . the waving of a Rebel flag, gangs of youths hitting and using abusive language, and playing of Dixie, disrespect for the national anthem and flag, and the label rebel are racially irritating."

Other testimony of the defendant-intervenors was that the symbols meant "Escambia High" and generally carried no racial meaning. That testimony also indicated that a small number of white students (around two hundred) had used the symbols in a racially derogatory manner. Plaintiff-intervenors' testimony indicated that not all whites considered the symbols as racially derogatory, but that many of them did.

Based on the evidence before the court, it makes the following findings of fact:

(1) That the name "Rebels" and the use of the Confederate Battle Flag were and still are racially irritating to a substantial number of black students at this school;

(2) That there were various causes of racial tension at Escambia High School, but the use of these symbols was a significant contributing cause;

(3) That, as the dispute gained momentum, the continued use of the symbols became a focal issue, and that the symbols became even a greater source of racial tension and an incentive to violence;

(4) That the use at the school of the symbols is a significant obstacle to the effective operation of a unitary school;

(5) That the use of such symbols at the school is likely to continue to be a source of racial tension and a cause of disruption and violence;

(6) That the symbols were not chosen as racial irritants; that to most, but not all, white students they do not carry an offensive racial connotation, but that they do carry such connotation to a substantial number of the black students, as well as to a minority of the white students.

This case involves two factually related but legally distinct issues. The first consists of the effects from the use of the symbols by the school as its officially approved designation. The second concerns the effects of the private use of the symbols by students in the school environment. This distinction must be made because the law separates state encouraged discrimination from purely private discrimination. Contrast: Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) and Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1958, 26 L.Ed.2d 142 (1970) with Moose Lodge, No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L. Ed.2d 627 (1972).

### 1. Official use of the symbols

As indicated, the defendants have not contested that the official use of the symbols constitutes state action, nor do they argue that the School Board's delegation of the choice of the school's symbols to the student body immunized the Board from legal responsibility. Rather they argue that, unless the choice of the symbols was made from an impermissible motive, students had a First Amendment right to select whatever symbols they wanted. The plaintiff-intervenors object to this theory. In their view, the symbols must be viewed from the perspective of the black students. They contend, if the symbols have a discriminatory effect, they must be abolished,

regardless of the purpose for which they were intended.

This issue has not been specifically considered by other courts, but the prior case law does require the School Board to act in a manner which produces a non-discriminatory result regardless of its intent.

In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), racial segregation in public schools was held unconstitutional. In Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), the court ordered school boards operating a dual system of education to effectuate a transition to a unitary school system with all deliberate speed. The court in Brown II noted that "to effectuate this interest may call for elimination of a variety of obstacles in making this transition." Id at 300, 75 S.Ct. at 756. In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the court re-emphasized these principles and concluded that:

"School boards . . . were nevertheless clearly charged with *the affirmative duty to take whatever steps might be necessary* to convert to a unitary system in which racial discrimination would be eliminated *root and branch.*" Id. at 437–438, 88 S.Ct. at 1694 (Emphasis added)

Unlike the situation in *Green,* the School Board here is not maintaining a dual system of public education. However, the expansive language of *Green* indicates its principles should be applicable to any situation where obstacles are present to an effective unitary school system. Thus, under *Green,* the School Board is not only under an obligation not to foster discrimination, but to affirmatively eliminate impediments to a unitary system of education.

This interpretation of *Green* appears to conform to the holding in Smith v. St. Tammany, 316 F.Supp. 1174, aff'd 448 F.2d 414 (5th Cir. 1971). In that case

the appellate court noted that Confederate symbols used in that case "[expressed] the school board's or its employees' desire to maintain segregated schools." Id. at 415. However, the district judge's decision was not based on that point. Rather it focused on the reaction of the black students to that symbol. As the opinion states:

"At the moment, the Covington principal insists on the display of the Confederate battle flag; but the display of that flag is an affront to every Negro student in the school, just as the display of the Black Panther flag would be an affront to every white student in a school whose principal was a Negro." 316 F.Supp. at 1176.

Thus, while the precise issue of whether discrimination should be judged by its effects on a unitary system or by the intent of school board was not directly faced by the Fifth Circuit, that court did approve Judge Heebe's order which parallels the approach adopted in this opinion.

In Melton v. Young, 465 F.2d 1332 (6th Cir. 1972), cert. den. 411 U.S. 951, 93 S.Ct. 1926, 36 L.Ed.2d 414 (1973) the court upheld the suspension of a student for wearing the Confederate Battle Flag contrary to a school board regulation. The court held that the student's conduct was not protected by the First Amendment. While that case differs slightly because it deals with a school board regulation, the thrust of the opinion is directly contrary to the theory advanced by the defendants.

Defendants' sole authority in support of their position is Banks v. Muncie,[3] 433 F.2d 292 (7th Cir. 1970). That case is factually distinguishable in that the record did not disclose the violence or the prior history of legally sanctioned segregation found in this case. However, apart from these factual differences, this court does not accept that decision's legal underpinnings. First, the opinion did not cite the *Green* decision,

---

3. Even there the court recommended against their continued use.

388

which this court feels is highly relevant. Second, *Banks* is based on the premise that as long as a governmental body is operating under a "neutral" non-discriminatory decision-making process, any discriminatory effects of that process are immaterial. Cf. Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L. Ed.2d 616 (1969) (Harlan, concurring). However, this reasoning is difficult to harmonize with the majority holding in Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967). There the court upheld a California determination that the adoption of a state constitutional amendment respecting open-housing legislation was unconstitutional, since it put the state in a position of encouraging discrimination. Surely the referendum procedure used by California was a "neutral" process, and yet that process was held invalid in light of the amendment's consequences. The rationale of *Reitman* would seem even more compelling in the context of a court-supervised desegregation plan where the school board is required to advance affirmative programs to implement and maintain a unitary system.

Finally, the rationale of *Banks*, which looks to the intent of the school board's actions, requires a court to enter the murky area of an official body's motivations. Courts have historically been unwilling to enter this area on the grounds that subjective motivations are difficult to determine. Fletcher v. Peck, 6 Cranch 87, 3 L.Ed. 162 (1810). Any rule of law which requires a specific showing of discriminatory motive might make decisions in this area needlessly difficult and perhaps impossible to formulate.

■ Thus, the court concludes that the symbols must be removed if they adversely affect the maintenance of a unitary system of education in any significant manner. While discriminatory motive may have some bearing on the is-

sue, the principal focus should be on the operational results of the acts.

■ On the basis of its findings of fact, the court concludes, and holds, that the name "Rebels" and the use of the Confederate Battle Flag seriously interfered with the effective operation of a unitary system at this school. Regardless of the intent of many white students or that of the defendants, these symbols were a source of irritation to many of the black students, inhibited their full participation at the school, and eventually were a source of racial violence. While it is unfortunate that the use of the symbols took on the significance now attached to them, that significance is now firmly implanted in this school. Removal of the symbols may not eliminate racial tension at the school. However, as long as the symbols remain, this tension will have a continuing, visual focal point. A unitary educational system cannot be maintained under such conditions.

## 2. *Private use of the symbols*

■■ The second issue in this case deals with the use of the symbols by individual students. Since the Fourteenth Amendment does not ban private discrimination (*The Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1889)), any limitation placed on private speech must be based on more than the speech's discriminatory content.[4] Any limitation imposed on student conduct or speech must be justified by a valid state interest. Tinker v. DesMoines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), Grayned v. Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), Melton v. Young, 465 F.2d 1332 (6th Cir. 1972) cert. den. 411 U.S. 951, 93 S.Ct. 1926, 36 L.Ed.2d 414 (1973).

The test used in determining whether individual expression may be limited within a school environment was formulated in *Tinker*, supra. Under that test,

---

4. This does not necessarily preclude a finding of impermissible state action in certain situations of school board acquiescence in student conduct.

speech is protected. However, the court stated:

"But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or the type of behavior—materially disrupts classwork or involves substantial disorder or an invasion of the rights of others is of course not immunized by the constitutional guarantee of free speech." Id., 393 U.S. at 513, 89 S.Ct. at 740.

This situation was contrasted to one consisting of a mere "undifferentiated fear or apprehension of disturbance," (Id at 508) which was held insufficient to limit expression. This formulation was a restatement of the position of the Fifth Circuit announced in Burnside v. Byars, 363 F.2d 744 (1966) and Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (1966).

█ On the evidence before it, the court finds that the use of the Confederate Battle Flag by individual students was a source of violence and disruption at the school and that the tensions surrounding the symbols have not subsided but have likely increased, and will continue to increase. Under these circumstances the wearing or displaying of the Confederate Battle Flag by individual students while attending school or at school activities should be prohibited. This prohibition is not based on mere apprehension of disturbance, but on evidence indicating a substantial probability of serious disruption and violence if individual use is not limited. In addition, use of the symbols subsequent to the order of this court prohibiting use as school symbols could not reasonably be said to be use as school symbols; they could only be used as symbols of provocation to anger black students. In this situation, the use of the symbols is not unlike the "fighting words" con-

demned in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031 (1942), and is especially dangerous in light of numerical strength of the white students at this school.

█ One point of distinction between the previously-cited cases and the present is that the restrictions imposed flow directly from the court rather than from a school board or city ordinance. However, this distinction does not change the result. The jurisdiction of this court is based on its continuing supervision over the integration of the Escambia County School System. As a result the court has jurisdiction to adopt regulations and requirements in the absence of school board action to achieve a unitary school system. Green v. County School Board, supra, Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). It is here evident that the private use of the symbols was also preventing the effective operation of a unitary school system. While it is true that purely private discrimination is not actionable, private discrimination which impedes the maintenance of unitary system can be subject to court regulation. Under *Tinker* requirements, a court has the power to regulate certain types of expression in a situation such as that here presented. Hopefully, this court's order will not only protect black students from intimidation but will also help to achieve a more stable educational environment for all students. However, that this court's order may or may not incidentally help to achieve that laudable objective does not deprive this court of jurisdiction to enter the order that it will enter in this case respecting the private use of these symbols.

By separate final judgment the preliminary injunction will be made permanent, with the only changes made therein being those to update its requirements in view of the passage of time.