Filed:  July 2, 2004

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 02-1266
(CA-01-53-2-12)

MATTHEW DIXON,

Plaintiff - Appellant,

versus

COBURG DAIRY, INCORPORATED,

Defendant - Appellee.

-------------------------

EQUAL EMPLOYMENT ADVISORY COUNCIL,

Amicus Curiae.

O R D E R

The court amends its opinion on rehearing en banc, filed May 25, 2004, as follows:

On page 14, final line of text -- the word "employees" is corrected to read "employers."

On page 15, second paragraph, line 20 -- the cross-reference "supra note 8" is corrected to read "supra note 2."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

ON REHEARING EN BANC

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MATTHEW DIXON,
            *Plaintiff-Appellant,*

v.

COBURG DAIRY, INCORPORATED,
            *Defendant-Appellee.*

⎫
⎬   No. 02-1266
⎭

EQUAL EMPLOYMENT ADVISORY
COUNCIL,
            *Amicus Curiae.*

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, District Judge.
(CA-01-53-2-12)

Argued: December 2, 2003

Decided: May 25, 2004

Before WILKINS, Chief Judge, and WIDENER, WILKINSON,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, KING, GREGORY, SHEDD, and DUNCAN,
Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge
Williams wrote the opinion, in which Chief Judge Wilkins and Judges
Widener, Wilkinson, Niemeyer, Luttig, Traxler, Shedd, and Duncan
concur. Judge Michael wrote a separate opinion concurring in the

judgment. Judge Motz concurred in the judgment. Judge King wrote a separate concurring opinion in which Judge Motz joined. Judge Gregory wrote a separate opinion concurring in the judgment.

## COUNSEL

**ARGUED:** Samuel Wilson Howell, IV, HOWELL & LINKOUS, L.L.C., Charleston, South Carolina, for Appellant. J. Thomas Kilpatrick, ALSTON & BIRD, L.L.P., Atlanta, Georgia, for Appellee. **ON BRIEF:** Alan B. Linkous, HOWELL & LINKOUS, L.L.C., Charleston, South Carolina; Mikell R. Scarborough, Charleston, South Carolina, for Appellant. Christopher S. Enloe, ALSTON & BIRD, L.L.P., Atlanta, Georgia, for Appellee. Ann Elizabeth Reesman, Rae T. Vann, MCGUINESS, NORRIS & WILLIAMS, L.L.P., Washington, D.C., for Amicus Curiae.

## OPINION

WILLIAMS, Circuit Judge:

Matthew Dixon initiated this action in South Carolina state court, alleging that Coburg Dairy, Inc. unlawfully terminated his employment in violation of South Carolina law. Coburg removed the case to the United States District Court for the District of South Carolina, asserting that the court had subject matter jurisdiction over the case because it involved a substantial question of federal law. The district court denied Dixon's motion to remand the case to state court and granted summary judgment to Coburg on all of Dixon's claims. Sitting en banc, we hold that the district court lacked subject matter jurisdiction to hear this case. Accordingly, we reverse and remand with instructions that the case be remanded to the South Carolina Court of Common Pleas.

I.

Dixon began working for Coburg in 1997 as a mechanic. Dixon is a member of the Sons of Confederate Veterans, a Tennessee non-

profit corporation, "who[se members] can prove genealogically that one of their ancestors served honorably in the armed forces of the Confederate States of America." *See Sons of Confederate Veterans, Inc. v. Comm'n of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 613 n.1 (4th Cir. 2002). Dixon brought with him to work a personal tool box, to which he had affixed two decals depicting the Confederate battle flag. The decals offended one of Dixon's coworkers, who complained to Coburg management, citing the company's anti-harassment policy.[1] Coburg asked Dixon to remove the decals from his toolbox and, when he refused, offered to buy him a new, unadorned toolbox. Dixon declined, explaining that "his heritage was 'not for sale,'" and asserting that he had a First Amendment right to display the Confederate battle flag.[2] (J.A. at 10-11.) Unable to reach a compromise, Coburg terminated Dixon on September 5, 2000.

Dixon then filed suit in the South Carolina Court of Common Pleas. The complaint included nine causes of action. Critical to this appeal are the first, third and fourth causes of action, which allege that Dixon was terminated in violation of Section 16-17-560 of the South Carolina Code and that the discharge was in retaliation for his exercise of constitutional rights.[3] Section 16-17-560 makes it "unlawful

(Text continued on page 5)

---

[1]The policy prohibits "any form of . . . harassment because of race, color, religion, sex, age, disability, national origin, or status as a Vietnam era or disabled veteran." (J.A. at 42.) It specifies that harassment may take the form of "visual conduct such as derogatory posters, cartoons, drawings or gestures." (J.A. at 42.)

[2]In early 2000, South Carolinians were involved in a heated debate about whether to remove the Confederate battle flag from atop their state capitol building. Dixon points out that this was "a burning issue in the State of South Carolina," during a "period of intense national scrutiny and public debate." (Appellant's Br. at 4.)

[3]The relevant portions of the complaint read as follows:

FOR A FIRST CAUSE OF ACTION

(Violation of Constitutional Rights)

All of the pleadings previously alleged are hereby realleged and repeated and made a part of the pleadings contained herein.

11.   SC Code § 16-17-560 states it is unlawful to discharge a citizen from employment because of the exercise of political

rights and privileges guaranteed under the Constitution of the United States and this state. The First Amendment to the U.S. Constitution and S.C. Constitution Article I, Section 2, provide for freedom of speech, assembly and the right to redress of grievances.

12.    Plaintiff's termination arose from the exercise of his right of free speech to display the Confederate flag. Coburg violated the constitutional rights of its employee by its termination of Plaintiff.

13.    Coburg's termination of Plaintiff for display of the flag constitutes a violation of his constitutional rights entitling Plaintiff to an award for damages.

. . .

### FOR A THIRD CAUSE OF ACTION

#### (Violation of Public Policy)

All of the pleadings previously alleged are hereby realleged and repeated and made a part of the pleadings contained herein.

16.    SC Code § 16-17-560 provides for a private civil cause of action where the wrongful discharge is a "crime against public policy."

17.    The Defendant's termination of the Plaintiff for display of the Confederate flag. Defendant's actions constitute a violation of South Carolina criminal law and therefore a violation of the public policy of this State.

18.    Coburg's termination of Plaintiff for display of the flag constitutes a violation of this statute entitling Plaintiff to an award for damages.

### FOR A FOURTH CAUSE OF ACTION

#### (Retaliatory Discharge)

All of the pleadings previously alleged are hereby realleged and repeated and made a part of the pleadings contained herein.

19.    Coburg's actions, through its agents attempts to control the content of Plaintiff's right of free speech through constant and repeated efforts to get him to abandon his constitutionally pro-

for a person to . . . discharge a citizen from employment or occupation . . . because of political opinions or the exercise of political rights and privileges guaranteed . . . by the Constitution and laws of the United States or by the Constitution and laws of [South Carolina]." S.C. Code Ann. § 16-17-560.

Coburg then removed the case to federal court, asserting that the district court had original jurisdiction pursuant to 28 U.S.C.A. § 1331 (West 1993), because the case involved a substantial question of federal law. Dixon moved for the district court to remand the case to state court, and the district court denied the motion. The parties then filed cross-motions for summary judgment, and the district court granted summary judgment in favor of Coburg on all claims and dismissed the case. Dixon appealed, and a divided panel of this court affirmed the district court's judgment in part and reversed in part.[4] *Dixon v. Coburg Dairy, Inc.*, 330 F.3d 250 (4th Cir.) *vacated & reh'g en banc granted*, (4th Cir. Sept. 16, 2003). A majority of full-time, active circuit judges voted to rehear the case en banc.

---

tected rights of free speech by demanding that he remove the flag from his tool box and then, ultimately, terminating him for exercise of that same right, constitute retaliatory discharge of Plaintiff.

20.   Coburg's termination of Plaintiff for retaliatory discharge entitles Plaintiff to an award for actual and punitive damages in an amount to be determined by the trier of fact.

(J.A. at 12-14.)

[4]The panel majority opinion reversed the grant of summary judgment on the first cause of action under the insubstantiality doctrine, holding that the district court lacked jurisdiction over the claim. *Dixon v. Coburg Dairy, Inc.*, 330 F.3d 250, 255 (4th Cir.) (citing *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974)), *vacated & reh'g en banc granted*, (4th Cir. Sept. 16, 2003). The panel majority affirmed the district court's grant of summary judgment on the remaining causes of action. *Id.*

II.

We review questions of subject matter jurisdiction de novo, "including those relating to the propriety of removal." *Mayes v. Rapoport*, 198 F.3d 457, 460 (4th Cir. 1999). The burden of demonstrating jurisdiction resides with "the party seeking removal." *Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994). We are obliged to construe removal jurisdiction strictly because of the "significant federalism concerns" implicated. *Id.* Therefore, "[i]f federal jurisdiction is doubtful, a remand [to state court] is necessary." *Id.*

III.

Section 1441 of Title 28 provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C.A. § 1441(a) (West 1994). In this case, Coburg alleges that removal was proper because the district court had original jurisdiction to hear Dixon's case under 28 U.S.C.A. § 1331. Section 1331 grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331. Thus, we must decide whether Dixon's claim "aris[es] under the Constitution, laws, or treaties of the United States." *Id.*

The vast majority of lawsuits "arise under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) (Holmes, J.); *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808 (1986). Thus, we must "first discern whether federal or state law creates the cause of action. . . . In cases where federal law *creates* the cause of action, the courts of the United States unquestionably have federal subject matter jurisdiction." *Mulcahey*, 29 F.3d at 151. In this case, Dixon's cause of action was created by South Carolina law not federal law, but our inquiry does not end there. Instead, we must determine whether this case is within the "small class of cases where, even though the cause of action is not created by federal law, the case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law

within the meaning of 28 U.S.C. § 1331." *Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 806 (4th Cir. 1996). Thus, "a case may arise under federal law 'where the vindication of a right under state law necessarily turn[s] on some construction of federal law,'" *Merrell Dow*, 478 U.S. at 808 (quoting *Franchise Tax Bd. v. Const. Laborers Vac. Trust*, 463 U.S. 1, 9 (1983)), but "only [if] . . . the plaintiff's right to relief *necessarily depends* on a *substantial* question of federal law," *Franchise Tax Bd.*, 463 U.S. at 28 (emphases added). Thus, in the absence of another jurisdictional ground, a defendant seeking to remove a case in which state law creates the plaintiff's cause of action must establish two things: (1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial. If either of these two elements is lacking, removal is improper and the case should be remanded to state court. As discussed below, we conclude that Dixon's complaint satisfies neither of these requirements.

## A.

A plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when *every* legal theory supporting the claim requires the resolution of a federal issue. *Mulcahey*, 29 F.3d at 153 ("[I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist."); *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 810 (1988)(holding that "a claim supported by alternative theories in the complaint may not form the basis for [patent] jurisdiction unless patent law is essential to each of those theories" and noting the similarities between the patent and federal question jurisdictional statutes). In other words, if the plaintiff can support his claim with even one theory that does not call for an interpretation of federal law, his claim does not "arise under" federal law for purposes of § 1331.

Our opinion in *Mulcahey* nicely illustrates the foregoing rule. In *Mulcahey*, the plaintiffs alleged that the Columbia Organic Chemicals Company had negligently released hazardous substances into the soil. *Mulcahey*, 29 F.3d at 149. The plaintiffs relied on at least the following two alternative theories of liability to establish their negligence

claim: (1) Columbia Organic was negligent per se because it had violated several federal environmental statutes; and (2) Columbia Organic was negligent per se because it had violated various state and local environmental laws. *Id.* at 153-54. The plaintiffs' negligence claim thus relied on multiple theories of liability, only one of which required the resolution of a federal issue. *Id.* at 153. In other words, "[e]ven if Columbia Organic was found not to have violated any federal statute, the Plaintiffs might still [have] be[en] entitled to recover under an alternative theory of negligence." *Id.* We held that in light of *Christianson*, "because the Plaintiffs' alternative theory of negligence *per se* [under the federal environmental statutes] [was] not 'essential' to their negligence [claim], no federal subject matter jurisdiction exist[ed]." *Id.* at 154.

Coburg asserts that Dixon's complaint necessarily depends on the resolution of a question of federal law, because, according to Coburg, Dixon must prove that Coburg violated his First Amendment rights to free speech for Coburg to be liable under Section 16-17-560 of the South Carolina Code. Specifically, Coburg asserts that "Dixon pled one violation of constitutional rights claim under Section 16-17-560, with one theory — namely, that Coburg violated his constitutional rights through his discharge." (Appellee's Br. at 12-13.) Coburg points to Paragraph 13 of the complaint's first cause of action to support its narrow reading of Dixon's complaint. Paragraph 13 reads, "Coburg's termination of Plaintiff for display of the flag constitutes a violation of his constitutional rights entitling Plaintiff to an award for damages."[5] (J.A. at 12.) After considering Dixon's complaint as a whole, we reject Coburg's restrictive reading.

---

[5]To the extent that Dixon's complaint can be interpreted as stating a cause of action based directly on the First Amendment, such a claim would be too insubstantial to invoke federal question jurisdiction because the First Amendment does not apply to private employers. *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974) ("[F]ederal courts are without power to entertain claims otherwise within their jurisdiction if they are so attenuated and unsubstantial as to be absolutely devoid of merit, wholly insubstantial, obviously frivolous, plainly unsubstantial, or no longer open to discussion.") (internal quotation marks and citations omitted); *see also Davis v. Pak*, 856 F.2d 648, 651 (4th Cir. 1988)(same).

Dixon alleges, in his third cause of action, that "Section 16-17-560 provides for a private civil cause of action where the wrongful discharge is a 'crime against public policy.'" (J.A. at 13.) According to Dixon, "Coburg's termination of Plaintiff for display of the flag constitutes a violation of this statute entitling Plaintiff to an award for damages." (J.A. at 13.) Moreover, Paragraph 11 of the complaint, which is part of the same cause of action as the passage that Coburg relies upon for its narrow reading of the complaint, refers specifically to Article I, Section 2 of the South Carolina Constitution, which provides that "[t]he General Assembly shall make no law . . . abridging the freedom of speech." S.C. Const. art. I, § 2 (1977). Similarly, in alleging that he was terminated for exercising "constitutionally protected rights of free speech" in his fourth cause of action, Dixon "reallege[s] and repeat[s]" the pleadings previously alleged, thus including the reference in the first cause of action to Article I, Section 2 of the South Carolina Constitution. (J.A. at 13.)

Therefore, although Dixon's complaint does reference the First Amendment, none of its causes of action rely exclusively on a First Amendment violation to establish Coburg's liability under Section 16-17-560. Properly read, Dixon's complaint alleges a violation of Section 16-17-560 in its entirety. Accordingly, Dixon's complaint could support a finding of liability for violating Section 16-17-560 under any of the following three theories — (1) Dixon was fired because of his political opinions; (2) Dixon was fired for exercising political rights guaranteed by the United States Constitution; and (3) Dixon was fired for exercising political rights guaranteed by the South Carolina Constitution. *See Conley v. Gibson*, 355 U.S. 41, 47 (1957) (holding that a complaint is sufficient if it gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Of the three alternative theories, only the second even arguably involves the resolution of a substantial question of federal law. Because Dixon could prove that Coburg terminated him in violation of Section 16-17-560 under the first and third theories without proving the second theory, Dixon's claim that Coburg violated Section 16-17-560 does not necessarily depend on a question of federal law. *Mul-*

*cahey*, 29 F.3d at 154. Accordingly, the district court did not have original jurisdiction to hear this case and removal was improper.[6]

## B.

Even if Dixon's claim had relied exclusively on the First Amendment to establish a violation of Section 16-17-560 and thus necessarily depended on a question of federal law, the question of federal law raised by his complaint is not substantial. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 814, 817 (1986) (holding that "a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation" does not raise a substantial question of federal law). In *Merrell Dow*, the Court reasoned that to ignore Congress' decision not to create a private federal remedy during the § 1331 jurisdictional inquiry would "flout, or at least undermine, congressional intent." *Id.* at 812; *see also id.* at 811 (noting that congressional silence is an important indication of congressional intent when determining if there is a private federal remedy); *Cort v. Ash*, 422 U.S. 35, 82-84 (1975). Congress has extended numerous constitutionally inspired protections to members of the private workplace, *see*, *e.g.*, 42 U.S.C.A. § 2000e-2 (West 2003) (making it an illegal employment practice to "discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."), but notably has refrained from extending free speech rights to the private work force. We believe that Congress' decision not to create a federal remedy for members of the private workforce whose employers restrict their freedom of speech is "tantamount to a congressional conclusion that the presence of a claimed

---

[6]Coburg also relies on "another underlying federal issue in this case — the scope and uniformity of Title VII of the Civil Rights Act." (Appellee's Br. at 17.) In essence, Coburg argues that Title VII, 42 U.S.C.A. § 2000e-2(a) (West ), preempts Section 16-17-560, at least as Dixon interprets it to apply in this case. At most, Coburg has alleged conflict preemption. Because conflict preemption is a defense to a cause of action, the well-pleaded complaint rule bars its use as a foundation for federal question jurisdiction. *Sonoco Products Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 371 (4th Cir. 2003) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987)).

violation of the [First Amendment] as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 814.

Moreover, even when Congress does create a private cause of action for the violation of a federal law, federal question jurisdiction may be lacking over a state law claim predicated on a violation of that law. *Mulcahey*, 29 F.3d at 152-53. If a particular plaintiff is barred from bringing the private, federal cause of action, either substantively or procedurally, no federal subject matter jurisdiction exists over that plaintiff's state cause of action predicated on a violation of the same federal law. *Mulcahey*, 29 F.3d at 152-53. In *Mulcahey*, we "conclude[d] that the Plaintiffs' inability to proceed under [a federal] statute[ ] constitute[d] a 'congressional conclusion that the presence of a claimed violation of the statute[ ] as an element of a state cause of action [wa]s insufficiently 'substantial' to confer federal question jurisdiction.'" *Id.* at 153 (quoting *Merrell Dow*, 478 U.S. at 814).

Here, Congress has created a private cause of action to remedy violations of the rights secured by the United States Constitution, *see* 42 U.S.C.A. § 1983 (West 2003) ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law. . . ."), but that remedy is unavailable to Dixon, because Coburg did not terminate Dixon under color of state law. We believe "that [Dixon's] inability to proceed under [§ 1983] constitutes a 'congressional conclusion that the presence of a claimed violation of the [First Amendment] as an element of a state cause of action is insufficiently 'substantial' to confer federal question jurisdiction.'" *Mulcahey*, 29 F.3d at 153 (quoting *Merrell Dow*, 478 U.S. at 814).

Accordingly, even if we construed Dixon's complaint in such a way that it necessarily depended on federal law, we would conclude that the question of federal law that it raises is not substantial. Thus, the district court did not have original jurisdiction to hear this case and removal was improper.

IV.

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions that the case be remanded to the South Carolina Court of Common Pleas.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

MICHAEL, Circuit Judge, concurring in the judgment:

Because Matthew Dixon's complaint asserts only state law claims against his former employer, Coburg Dairy, Inc., I concur in the judgment to remand his case to South Carolina state court. Although some of Dixon's state law claims refer to the First Amendment, these claims do not "turn[ ] on [a] construction of federal law." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986). That is because the First Amendment, as a matter of federal law, does not regulate the conduct of a private employer. *See, e.g., Yatvin v. Madison Metro. School Dist.*, 840 F.2d 412, 420 (7th Cir. 1988).

KING, Circuit Judge, concurring:

I concur in the view of my able colleague Judge Williams that the district court lacked subject matter jurisdiction to address this dispute, and I agree with her conclusion that its removal to federal court was improper. I write separately to highlight and adopt the reasoning of my friend Judge Goodwin of West Virginia, who served our Court on the panel that initially considered this jurisdictional issue. As he correctly recognized, the resolution of the Dixon complaint does not depend on *any* question of federal law. *See Dixon v. Coburg Dairy, Inc.*, 330 F.3d 250, 266 (4th Cir. 2003) (Goodwin, District Judge, sitting by designation, concurring in part and dissenting in part) (observing that question of whether Dixon was "exercising his First Amendment rights" cannot be answered under federal law), *vacated & reh'g en banc granted*, (4th Cir. Sept. 16, 2003). Although Judge Williams's analysis adheres to circuit precedent and achieves the proper result, Dixon's complaint does not even arguably give rise to federal jurisdiction. As I see it, section 16-17-560 of the South Carolina Code seeks to create a state law claim implicating the Constitu-

tion of the United States; South Carolina, however, is powerless to mandate the application of First Amendment jurisprudence in a federal proceeding where the alleged constitutional deprivation stems solely from private action.

A right secured by the First Amendment is never exercised in the abstract; rather, it may be infringed only when a state actor has sought or seeks to suppress protected expression. *See, e.g.*, *CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973) (holding that First Amendment restrains "government action, not that of private persons"). In this situation, no state actor was involved in Dixon's discharge, and thus his First Amendment rights could not have been contravened. Given these circumstances, Dixon's complaint cannot be read to establish federal question jurisdiction. And as Judge Goodwin explained, "one cannot determine whether a specific expressive activity is an 'exercise of First Amendment rights' without reference to a state actor who is trying to suppress that expressive activity." *Dixon*, 330 F.3d at 266. This is therefore a state law dispute only, with no federal jurisprudential counterpart.

Pursuant to the foregoing, I am pleased to concur.

GREGORY, Circuit Judge, concurring in the judgment:

I agree with the majority's application of *Merrell Dow* and *Christianson* in Part III-A of its opinion, therefore I concur in the judgment. I write separately, however, to briefly address an important issue raised by Appellee Coburg Dairy and *Amicus Curiae* Equal Employment Advisory Council, namely the potential clash between an employer's duties and liabilities under Title VII, 42 U.S.C. § 2000e *et seq.*, and those which purportedly flow from S.C. Code Ann. § 16-17-560 if the statute applies in the manner that Mr. Dixon advocates.

## I.

### A.

Before the district court, *see* Def.'s Mem. Supp. Mot. Summ. J. at 3-12, and to a lesser extent on appeal, *see* Br. of Appellee at 17-19,

Coburg attempted to ground its "arising under" arguments in a federal interest stemming from Title VII. Title VII of the Civil Rights Act of 1964 prohibits discrimination by an employer against a covered individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). At the district court, Coburg Dairy presented a lengthy discussion of the conflict it perceives between its affirmative duties under Title VII to provide a workplace free of discrimination and the opposite results that might flow from Mr. Dixon's favored interpretation[1] of the South Carolina Code. *See* Def.'s Mem. Supp. Mot. Summ. J. at 6-7 (arguing Dixon's "daily display of the flags plainly could have triggered Title VII liability" thus Coburg had a duty to remedy such potential workplace harassment, therefore it "end[ed] the alleged harassment" and took the opportunity "to limit or eliminate any potential liability for it"); *id.* at 8 ("Coburg, motivated by its duty under Title VII, opted to end Plaintiff's employment."). Moreover, Coburg argued that S.C. Code Ann. § 16-17-560 is preempted by Title VII. *Id.* at 8.[2] Likewise, on appeal, Coburg argues that "Dixon's violation of constitutional rights claim is preempted by Title VII because it aims to curtail the protections afforded by that statute and the cases interpreting it. . . . [P]ermitting his claim to proceed in state court poses a real risk to uniform enforcement of Title VII." Br. of Appellee at 17. In short, Coburg argues that S.C. Code Ann. § 16-17-560, which under Dixon's interpretation requires employers to carve out a safe space

---

[1]Dixon argues that his display of the flag in the workplace is "protected symbolic speech that is 'guaranteed to every citizen by the Constitution and laws of [South Carolina].'" Br. of Appellant at 28 (quoting S.C. Code Ann. § 16-17-560).

[2]Coburg presented these arguments through a federal preemption defense, however, rather than a declaratory judgment action, and such a defense is insufficient to obtain federal jurisdiction. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 391-93 (1987) (holding that ordinarily a case may not be removed on the basis of a federal defense unless the "complete pre-emption doctrine" applies); *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 282-84 (1987) (holding Title VII only preempts state law inconsistent with it). On appeal, Coburg admits the "preemption defense to Dixon's claim could [not] by itself warrant federal jurisdiction. . . . [But] is further proof of the substantial federal issues at stake . . . ." Br. of Appellee at 17 n.6 (citations omitted).

for the Confederate battle flag,[3] conflicts with an employer's affirmative duty to provide a harassment-free workplace under Title VII. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (stating Title VII's "'primary objective', like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm" (citation omitted)); *id.* (stating employers have an "affirmative obligation to prevent violations").

Coburg states that to prevent harassment in the workplace and to avoid charges of a hostile work environment, it has implemented an anti-harassment policy through which it investigates and responds to employee complaints. In this case, one of Dixon's Black co-workers was offended by Dixon's Confederate battle flag stickers and asked Dixon to remove them. When Dixon refused, the Black co-worker informed Coburg that he found the Confederate battle flags Dixon displayed to be racially offensive and in violation of the company's anti-harassment policy. As a result, Coburg investigated the complaint and "t[ook] prompt and adequate action to stop" the offensive conduct after being placed on notice. *Mikela v. City of Durham*, 183 F.3d 323, 332 (4th Cir. 1999). Coburg and *Amicus Curiae* Equal Employment Advisory Council assert that the South Carolina Code places a burdensome competing duty on employers. On the one hand, under Title VII, an employer must provide a harassment-free workplace. On the other, if Mr. Dixon's interpretation of S.C. Code Ann. § 16-17-560 prevails, the employer must allow employees to display symbols, like the Confederate battle flag, which other employees find offensive, harassing and emblematic of racial subordination. While, as Coburg admits, *supra* note 2, this partial preemption argument does not support federal jurisdiction, if Mr. Dixon's interpretation of the South Carolina statute is correct then the statute surely invites conflict with federal anti-discrimination law.[4]

---

[3]Dixon proffers that the Confederate battle flag is an official symbol of South Carolina. *See* Br. of Appellant at 27 (citing S.C. Code Ann. §§ 1-10-10, 16-17-560, 16-17-220, 10-1-160). He argues that any limitation on one's right to display that symbol constitutes a violation of S.C. Code Ann. § 16-17-560.

[4]At oral argument, Dixon's counsel acknowledged that the South Carolina statute creates "liberties" different than what the federal law allows:

## B.

If indeed South Carolina has carved out this safe haven for the Confederate flag, such action threatens to undermine the federal protections that individuals possess to be free of discrimination in the workplace. *See* Br. of Appellee at 18 (stating that employers will have to "pick their poison. They can choose to provide a harassment-free workplace by barring expressions of allegedly constitutionally protected but arguably harassing opinions and material . . . and get sued by that employee for violating Section 16-17-560. Or they can submit to the logic of Section 16-17-560 . . . and face a lawsuit alleging the creation of an ethnically and religiously hostile work environment in violation of Title VII."); Br. of *Amicus Curiae* Equal Employment Advisory Council at 21 ("At the core of Title VII compliance is the concept of proactive prevention."). It is unclear whether a single Confederate flag — or a set of decals — displayed in the workplace would support a Title VII claim. *Cf. Burrell v. Crown Cent. Petroleum, Inc.*, 255 F. Supp. 2d 591, 613-614 (E.D. Tex. 2003) (discussing employee's hostile work environment claim based on supervisor's confederate flag and picture of himself in confederate uniform, but granting summary judgment for defendant because plaintiff failed to report the incident to employer); *Gonzalez v. Fla. Dep't of Highway Safety & Motor Vehicles Div. of Fla. Highway Patrol*, 237 F. Supp. 2d 1338, 1354-55 (S.D. Fla. 2002) (granting summary judgment for defendant on plaintiff's hostile work environment claim, founded in part on co-worker's display of Confederate flag, because Plaintiff was not "directly exposed" to the symbol). If Mr. Dixon's interpretation of South Carolina's protection of one's right to display the flag in the workplace is correct, however, then presumably a situation could arise where a workplace becomes saturated with such symbols, thus causing conflict with the federal statute. For example, one may envi-

---

"South Carolina has been routinely the scapegoat of civil libertarian groups in the country. Finally, South Carolina is on the cutting edge of extending civil liberties and rights beyond the governmental workplace, but to the private workplace. Well beyond what the federal government has done, well beyond what other states have done by extending some civil liberties in the private workplace." (Recording of Oral Argument, December 2, 2003, Appellant's Rebuttal Argument.)

sion a situation whereby a South Carolina shop employs a single Black laborer in a workforce of twenty. If every one of the nineteen white workers displays the flag, invoking the protections of the South Carolina statute in the manner that Mr. Dixon advocates, and the single Black worker filed a Title VII claim alleging a hostile work environment, I do not believe the claim would be considered frivolous. *Cf. Augustus v. Sch. Bd. of Escambia County*, 361 F. Supp. 383, 389 (N.D. Fla. 1973) (finding the use of the Confederate battle flag by white students comparable to fighting words, as it became a source of violence and disruption, and the flag was "specially dangerous in light of the numerical strength of the white students"), *modified by* 507 F.2d 152 (5th Cir. 1975).

To understand why such an environment, or even a workplace with a less prevalence of the symbol, might be offensive or even hostile to some, I believe it is necessary to revisit the nature of the symbol. We have previously recognized the representations inherent in displaying the Confederate flag, stating:

> It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, that flag is identified with racial separation. Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African-Americans.

*United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001); *see also Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 305 F.3d 241, 242 (4th Cir. 2002) (Wilkinson, C.J.) (concurring in the denial of rehearing en banc) ("The vast majority of Virginians understand that one['s] proclamation of heritage is another's reminder of the unspeakable cruelties of human bondage. The vast majority of Virginians recognize the sad paradox of Confederate history—namely that individual southerners, so many good and decent in themselves, swore allegiance to a cause that thankfully was lost,

and to practices that no society should have sought to defend.") (here-inafter *SCV*). While those comments are eloquent and directly on point, I find the Confederate battle flag needs further contextualization within the greater narrative of the Civil War, the Confederacy and the flag's revival as a symbol of racial polarization during the middle of the last century to illustrate why many viewers find it offensive.

During the Civil War, those fighting under the flag of the United States — the same flag our men and women have fought under since the Continental Congress adopted it on June 14, 1777 — suffered nearly 650,000 casualties while combating Southern forces fighting under the Confederate battle flag. *See* United States Department of Defense, *Principal Wars in which the United States Participated: U.S. Military Personnel Serving and Casualties*, *available at* http://web1.whs.osd.mil/mmid/casualty/WCPRINCIPAL.pdf.    Since the war, many people, likewise good and decent themselves, have proclaimed the Confederate flags as symbols of pride, of heritage not hate. Mr. Dixon states: "He has a keen interest in his family's geneology [sic] . . . . His ancestors fought and died under the Confederate battle flag *for a cause in which they believed.*" Compl. ¶ 4 (emphasis added). However, we cannot wholly divorce the flying of the flag from the system of beliefs and those practices — which as Judge Wilkinson stated "no society should have sought to defend," *SCV*, *supra* — that undergirded the Confederacy, including racial subordination and slavery. While many Southerners unquestionably embrace the flag, not out of malice or continued belief in racial subordination, but out of genuine respect for their ancestors, we must also acknowledge that some minorities and other individuals feel offended, threatened or harassed by the symbol. Unfortunately, to its supporters at the time of its creation as well as some proponents today, *see Blanding*, *supra*, the Confederate flag undeniably represented, and represents, support for slavery, belief in Blacks as an inferior class, and opposition to the Republic.[5] Over the years since the

---

[5]On March 21, 1861, newly elected Vice-President of the Confederacy Alexander H. Stephens gave a speech in Savannah, Georgia in which he stated:

> [T]he new [Confederate] Constitution has put at rest *forever* all the agitating questions relating to our peculiar institutions-

war, some have attempted to divorce the Confederate flags from their intimate connections to these principles of subordination, but for many viewers of the symbol such a disconnect is impossible because of the historical facts and the overwhelming negative connotations which continue to flow therefrom.

   Some attempts to disgorge the Confederate flag of its negative content associated with the bleak realities of the Civil War and Jim Crow can be explained by the romanticism of what has been termed "Lost Cause" ideology.[6] Since the war's end, Lost Cause proponents have

---

African slavery as it exists among us — the proper *status* of the negro in our form of civilization. *This was the immediate cause of the late rupture and present revolution. . . . . Those ideas [of the United States Constitution], however, were fundamentally wrong. They rested upon the assumption of the equality of races. This was an error.* It was a sandy foundation, and the idea of a Government built upon it — when the "storm came and the wind blew, it *fell*."

*Our new Government is founded upon exactly the opposite ideas; its foundations are laid, its cornerstone rests, upon the great truth that the negro is not equal to the white man; that slavery, subordination to the superior race, is his natural and moral condition.* [Applause.] *This, our new Government, is the first, in the history of the world, based upon this great physical, philosophical, and moral truth.*

Alexander H. Stephens, *Cornerstone Address, March 21, 1861, in* 1 *The Rebellion Record: A Diary of American Events with Documents Narratives, Illustrative Incidents, Poetry, etc.* 44-46 (Frank Moore ed., 1862), *reprinted in* Paul Halsall, *Internet Modern History Sourcebook, available at* http://www.fordham.edu/halsall/mod/1861stephens.html. While in provisions such as the three-fifths clause the United States Constitution is undeniably problematic in its inability to confront the problems of race, the Confederate Constitution was overtly racist. For example, it prohibited the enactment of any law "denying or impairing the right of property in Negro slaves," Confederate Const. art. I, § 9, cl. 4, and required that escaped slaves be surrendered to their owners upon request, *id.* art. IV, § 2, cl. 3. *See generally* Paul Finkelman, *Affirmative Action for the Master Class: The Creation of the Proslavery Constitution,* 32 Akron L. Rev. 423 (1999).

[6]Alan T. Nolan summarizes Lost Cause ideology as follows: "[T]he Lost Cause was expressly a rationalization . . . . One reason for this was

cast the Civil War as a continuation of the revolution of 1776 — a noble revolution against a despotic Northern regime, a battle for sovereignty in tune with America's core constitutional principles, clothed in the language of states' rights and Jefferson Davis's pleas for "Southern honor." *See generally* Jefferson Davis, *The Rise and Fall of the Confederate Government* (1881); Edward A. Pollard, *The Lost Cause* (1866); Douglas Southall Freeman, *The South to Posterity: An Introduction to the Writing of Confederal History* (1939); Gaines M. Foster, *Ghosts of the Confederacy: Defeat, the Lost Cause, and the Emergence of the New South, 1865 to 1913* (1987). Yet no matter how noble these proponents of the ideology attempted to make the Lost Cause seem, they have had difficulty divorcing it from slavery, white supremacy and the beginnings of Jim Crow and American Apartheid. As Pollard wrote in 1868's *The Lost Cause Regained*, in which he urged reconciliation with conservative Northerners, "[t]o the extent of securing the supremacy of the white man . . . and the traditional liberties of the country . . . She [the South] really triumphs in the true cause of the war." Quoted in David W. Blight, *Race and Reunion: The Civil War in American Memory* 260 (2001) (internal quotation marks omitted).

Indeed, many offended by the Confederate flag find more current connections to oppression as the flag became an unfortunate symbol of the South's resistance to integration and equality from the late

---

'the need to justify the existence of slavery . . . even before the abolitionist attack from the North, Southerners began the defense of slavery as a social system that provided unique benefits, both for the slaves whom it placed under the fatherly care of a superior race and for the master who was given the freedom from toil necessary to the creation of a superior culture.'" Alan T. Nolan *The Anatomy of the Myth*, *in The Myth of the Lost Cause and Civil War History* 11, 14 (Gary W. Gallagher & Alan T. Nolan eds., 2000); *see also Brown v. Bd. of Sch. Comm'rs of Mobile County*, 542 F. Supp. 1078, 1094 n.14 (S.D. Ala. 1982) ("The South, having given all it had in the destructive Civil War, had little to show for it but 'The Lost Cause'. In the course of the next two decades, the 'lost cause' would be elevated to one of the most enduring myths of history, one that enabled the South to keep the blacks in their place, out of public office and out of the voting booth . . . ."), *aff'd*, 706 F.2d 1103 (11th Cir. 1983).

1940s through the 1960s. For example, Georgia incorporated the Confederate battle flag into its state flag in 1956 "during a regrettable period in Georgia's history when its public leaders were implementing a campaign of massive resistance to the Supreme Court's school desegregation rulings." *Coleman v. Miller*, 117 F.3d 527, 528 (11th Cir. 1997) (per curiam) (discussing the history of the Georgia flag and stating the Georgia legislature "chose as an official state symbol an emblem that historically had been associated with *white supremacy and resistance to federal authority*" (emphasis added)). South Carolina began flying the Confederate flag above the State Capitol in 1962. *See* Sue Anne Pressley, *Flag War Isn't Over at Carolina Statehouse*, Wash. Post, Jan. 16, 2001, at A3 ("When the flag went up, supporters said its purpose was to celebrate the Civil War centennial, but critics said its presence had more to do with opposition to the integration of schools then underway throughout the South."). Furthermore, much more recently the flag has continued to be associated with racial intolerance.[7]

Against this historical backdrop, it becomes more apparent why co-workers might feel offended, harassed and even threatened by the Confederate battle flag in the workplace, even if those who display the flag do so with no ill will. Thus, if Mr. Dixon's reading of the protections afforded by § 16-17-560 has merit, the Title VII concerns raised by Coburg Dairy and the employers comprising the Equal Employment Advisory Council seem particularly significant.

---

[7]*See, e.g.*, Christopher Schwarzen, *2 Teens Charged in Cross Burning: Youths Reportedly Had Targeted Black Pastor's Son*, Seattle Times, Apr. 1, 2004, at B3 (noting detectives investigating cross burning viewed pictures drawn by the accused teens including depictions of "Confederate flags with captions reading 'White Pride' and lynching victims dangling from trees").